ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| BCI Construction USA, Inc. | ) | ASBCA Nos. 62657, 62975, 63200 |
| | ) | |
| Under Contract No. W912DQ-17-C-1070 | ) | |

APPEARANCES FOR THE APPELLANT:  Ron Garber, Esq.
   Weissman Zucker Euster Morochnik
    & Garber, P.C.
   Atlanta, GA

                                  Timothy J. Walsh, Esq.
   Cathleen S. Aubuchon, Esq.
    Norton Rose Fulbright US, LLP
    St. Louis, MO

APPEARANCES FOR THE GOVERNMENT:  Michael P. Goodman, Esq.
   Engineer Chief Trial Attorney
   Virginia Murray, Esq.
   Jacob T. Simpson, Esq.
    Engineer Trial Attorneys
    U.S. Army Engineer District, Kansas City

OPINION BY ADMINISTRATIVE JUDGE STINSON
ON PARTIES' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

The United States Army Corps of Engineers (USACE), Kansas City District, entered a contract with appellant BCI Construction USA, Inc. (BCI), to perform repairs to the Tuttle Creek Stilling Basin. BCI submitted various delay, defective specification, and differing site conditions claims arising out of the project work. The contracting officer issued two final decisions denying, in part, BCI's claims, which BCI now appeals. We have jurisdiction pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§7101-7109. The parties submitted motions for partial summary judgment, response briefs, and reply briefs for consideration in deciding these appeals. For the reasons stated below, the Board grants-in-part and denies-in-part the government's motion for partial summary judgment, and grants-in-part and denies-in-part appellant's motion for partial summary judgment.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

By Board Order, the parties submitted a Joint Stipulation of Facts (JSF) in support of their motions for partial summary judgment.[1]  Our statement of facts relies upon the parties' JSF, as set forth below, as well as additional facts supported by record evidence, which we have determined are undisputed for the purpose of these motions.

Pre-Award Invitation for Bids

1.  In May 2017, the USACE, Kansas City District, issued Invitation for Bid (IFB) No. W912DQ-17-B-1005, "Construction Solicitation and Specifications," which included specifications for construction and repair of the Tuttle Creek Stilling Basin Wall located in Riley County, Kansas (R4, tab 5 at COE000002, COE000004).

2.  A stilling basin, which is part of a dam's water outlet works, is a depression in a channel or reservoir deep enough to reduce the velocity or turbulence of water flowing out of a dam (JSF ¶¶ 106-07).  The Tuttle Creek Stilling Basin sits adjacent to Tuttle Creek Dam, which feeds into the Big Blue River (R4, tab 5 at COE000085, tab 6 at COE000006); (*see also* JSF ¶¶ 106-07).  Tuttle Creek State Park is located just south of Tuttle Creek Dam and just east of the stilling basin (JSF ¶¶ 105-06; R4, tab 6 at COE000006).

3.  The IFB set forth the following project description:

> The work includes excavation along the landward side of the training walls along monoliths 1 through 12, demolishing and replacing the upper training wall portion to the first control joint and portions on the 1V on 0.59H slope, demolishing and replacing portions of the existing site drainage, filling the existing deep drainage system with flowable fill and replacing the drainage system with a shallower system, installation [of] new concrete columns

---

[1] In addition to the parties' JSF, each party submitted several iterations of additional statements of fact and competing statements of genuine issues of material fact. Appellant's additional material facts, dated February 24, 2023, included 193 paragraphs of additional facts.  The government's opposition to appellant's motion for partial summary judgment, dated February 24, 2023, included 79 paragraphs of additional facts.  The government's reply brief, dated March 24, 2023, included an additional 65 paragraphs of "reply facts."

> to provide a horizontal jacking surface for the installation
> of post-tensioned anchors and incidental related work.

(R4, tab 5 at COE000085)

4. An Executive Summary set forth in a May 2017 Design Documentation Report states, "[t]wo issues are identified and addressed with this project: (1) repair of the stilling basin wall drain system and (2) retrofitting the stilling basin walls due to overturning stability concerns" (JSF ¶¶ 9-10; R4, tab 315 at COE000002, COE000012).

5. The IFB incorporated by full text Federal Acquisition Regulation (FAR) 52.211-12, LIQUIDATED DAMAGES – CONSTRUCTION (SEP 2000), which stated, in part, "(a) [i]f the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of $860 for each calendar day of delay until the work is completed or accepted" (JSF ¶ 7; R4, tab 5 at COE0000034). The IFB did not include any information regarding the method the government utilized to compute the daily liquidated damages rate (app. additional material facts dated Feb. 24, 2023, ¶ 192; gov't reply ¶ 192).

6. The IFB included FAR 52.243-4 CHANGES (JUN 2007) requiring the contractor to assert its right to an adjustment within 30 days of receipt of a written change order, or by submitting to the contracting officer a written statement describing the nature and amount of its proposal (R4, tab 5 at COE00062-63). The IFB also included FAR.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) (*id.* at COE000064-66).

7. The IFB included FAR 52.216-1, TYPE OF CONTRACT (APR 1984), stating that "[t]he Government contemplates award of a Firm-Fixed Price contract resulting from this solicitation" (R4, tab 5 at COE000017; FAR 52.243-4(e)).

8. The IFB included FAR 52.236-21, SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION (FEB 1997), concerning shop drawings (R4, tab 5 at COE000061). Section (f) provided:

> If shop drawings show variations from the contract
> requirements, the Contractor shall describe such variations
> in writing, separate from the drawings, at the time of
> submission. If the Contracting Officer approves any such
> variation, the Contracting Officer shall issue an appropriate
> contract modification, except that, if the variation is minor

> or does not involve a change in price or in time of
> performance, a modification need not be issued.

(*Id.* at COE000062)

9. The IFB included FAR 52.236-27 SITE VISIT (CONSTRUCTION) (FEB 1995) – ALTERNATE I (FEB 1995), stating that "[t]he clauses at 52.236-2, Differing Site Conditions, and 52.236-3, Site Investigations and Conditions Affecting the Work, will be included in any contract awarded as a result of this solicitation," and that offerors "are urged and expected to inspect the site where the work will be performed") (R4, tab 5 at COE00021).

10. The IFB included FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984) (R4, tab 5 at COE000060).

11. The government issued a Determination of Liquidated Damages – Construction, dated January 18, 2017, finding that inclusion in the contract of FAR 52.211-12 was in the best interests of the government (R4, tab 1033). The document, prepared by Nathan McCarn, the government's Quality Assurance Representative (JSF ¶¶ 2, 24), included a breakdown of government construction oversight staff and support personnel on the project and a formula by which the government determined the daily liquidated damages rate of $860 based upon those labor costs (*id.*). Mr. McCarn's calculation sheet noted that "each Con Rep and Office Engineer should have two active contracts to administer," and that "Project Engineer duties normally involve working new solicitations as well" (R4, tab 1035; app. reply ex. D (dep. of Nathan L. McCarn at 160-61). However, Mr. McCarn was instructed to reduce the liquidated damages rate because the office "had several projects going on at the same time" (JSF ¶ 26) (R4, tab 1035; app. reply, ex. D (dep. of Nathan L. McCarn at 156-57, 159-60)). By increasing the number of on-going projects (Mr. McCarn assumed three or four concurrent projects) as a factor in the liquidated damages formula, Mr. McCarn effectively reduced the daily liquidated damages rate (*id.*).

12. A pre-bid site visit occurred on May 26, 2017, attended by a representative from BCI and other potential bidders (R4, tab 7 at COE000003). BCI submitted its bid in response to the IFB on June 22, 2017 (JSF ¶ 109; R4, tab 11 at COE000002).

Contract Award

13. By letter dated July 28, 2017, the government accepted BCI's bid in the amount of $8,261,206, and awarded BCI Contract No. W912DQ-17-C-1070 with base year CLIN Nos. 0001-0006, and option year CLIN Nos. 0007-0009 (R4, tab 11 at COE000002, tab 12 at COE000002). The contract required the contractor to

4

"provide all labor, equipment, and materials to complete all work associated with the specification and plans" (R4, tab 5 at COE000005-09).

14.  The government's July 28, 2017, notice of award letter, stated:

> Only a warranted Contracting Officer (either PCO or ACO) acting within their delegated limits has the authority to issue modifications or otherwise change the terms and conditions of this contract.  If an individual other than the Contracting Officer attempts to make changes to the terms and conditions of this contract you shall not proceed with the change and shall immediately notify the Contracting Officer.

(JSF ¶ 111; R4, tab 11 at COE000002-03)

15.  By letter dated August 10, 2017, the government issued the Notice to Proceed, stating that "work shall commence within 10 calendar days of receiving this Notice to Proceed and the period of performance will conclude no later than 720 calendar days after the receipt of this Notice to Proceed" (R4, tab 13 at COE000002; *see also* JSF ¶ 8).

16.  According to the Contractors Quality Control Report (QCR) Daily Log of Construction, dated March 20, 2018, BCI arrived at the site on March 20th and began mobilization (R4, tab 114 at COE000002).  BCI arrived at the site over seven months after issuance of the Notice to Proceed (JSF ¶¶ 8, 113).

Stop Work Orders

17.  By letter dated May 29, 2019, the government issued a Stop Work Order directing BCI "to stop all site construction activities under this contract due to the impending need to make high releases from Tuttle Creek Lake," and "to backfill all open excavations and evacuate material and equipment out of areas that could be subject to flooding during the high releases" (R4, tab 30 at COE000002).  The Stop Work Order noted BCI's entitlement, pursuant to FAR 52.242-15, "to an adjustment, under certain conditions, for any increase in the cost of performance of the contract as a result of this suspension" (*id.*).  By letter dated July 22, 2019, the government extended the Stop Work Order until September 1, 2019 (R4, tab 33 at COE000002).

18.  By letter dated September 9, 2019, BCI informed the government of its position that the Stop Work Order was a change to the contract which resulted from a differing site condition (R4, tab 37 at COE000002).  By letter dated September 25, 2019, the government responded, acknowledging that "the stop work order is a change

5

to the contract," but "is not considered a differing site condition" (R4, tab 40 at COE000002). The government also stated that BCI is "entitled an equitable adjustment" based upon the Stop Work Order and recognized "that there may be inefficiencies and potential additional costs associated with working through the winter season," but that "work can be accomplished and your original schedule did show performing work through the winter months" (*id.*).

19. By letter dated October 10, 2019, the government cancelled the Stop Work Order and directed BCI to resume contract performance on October 28, 2019 (R4, tab 41 at COE000002). The government issued two contract modifications extending the contract completion period 207 days based upon the suspension of work, specifically, Modification No. A00011, effective October 24, 2019, for 156 calendar days (R4, tab 44 at COE000002-03), and Modification No. R00016, effective December 23, 2019, for 51 calendar days (R4, tab 50 at COE000002-03; *see also* R4, tab 58 at COE000002-03). The government issued additional modifications extending the contract completion date a total of 111 days prior to the onset of the COVID 19 pandemic, specifically, Modification No. P00003, effective October 18, 2018, 11 calendar days for work related to a concrete crack at monolith 11L (R4, tab 820 at COE000002-03), Modification No. A00004, effective February 27, 2019, 65 calendar days for work related to a concrete crack at monolith 11L and a spall and crack on monolith 1 (R4, tab 822 at COE000002-03; *see also* R4, tab 829 at COE000002, tab 830 at COE000002), Modification No. A00008, effective July 11, 2019, three calendar days for weather related delay, and Modification No. A00012, effective January 14, 2020, 32 calendar days for work related to concrete cracks on concrete on monolith 10L (R4, tab 51 at COE000002-03).

Additional Facts and Contract Specifications Pertinent to Specific Claims
Supply of Ready-mix Concrete – Alleged Defective Specification

20. BCI's first complaint seeks $25,856.59, and a 21-day time extension, based upon an alleged defective specification regarding Ready-mix concrete (compl. ¶ 6 dtd. August 13, 2021).

21. Contract specification SECTION 01 33 00, SUBMITTAL PROCEDURES, included the following Submittal Descriptions (SD) for SD-02 Shop Drawings, which are defined as "[d]rawings, diagrams and schedules specifically prepared to illustrate some portion of the work," and SD-03 Product Data, which includes "[c]atalog cuts, illustrations, schedules, diagrams, performance charts, instructions and brochures illustrating size, physical appearance and other characteristics of materials, systems or equipment for some portion of the work" (R4, tab 5 at COE000196-97).

22. Contract specification SECTION 03 31 01.00 10, CAST-IN-PLACE STRUCTURAL CONCRETE FOR CIVIL WORKS (R4, tab 5 at COE000360),

specified that contractor submittals for Concrete Mix Designs were submitted as "SD-03 Product Data" (R4, tab 5 at COE000369; *see also id.* at COE000216).

23. Contract specification SECTION 03 31 01.00 10, paragraph 1.2, REFERENCES, included a reference to ASTM C618, (2012a) Standard Specification for Coal Fly Ash and Raw or Calcined Natural Pozzolan for Use in Concrete, which stated that the standard specification "form[ed] a part of this specification to the extent referenced" (R4, tab 5 at COE000363, COE000366).[2]

24. Contract specification SECTION 03 31 01.00 10, paragraph 2.1, Concrete Mix Designs, provided: "Concrete mix design is the responsibility of the Contractor. Trial batches and testing requirements for various qualities of concrete specified shall be the responsibility of the Contractor." (R4, tab 5 at COE000371)

25. Contract specification SECTION 03 31 01.00 10, paragraph 2.2.1, Cementitious Materials, provided: "[c]ementitious materials are portland cement, portland cement in combination with pozzolan or GGBF slag conforming to appropriate specifications listed [in the specifications] below" (JSF ¶115; R4, tab 5 at COE000373).

26. Contract specification SECTION 03 31 01.00 10, paragraph 2.2.1.3, Fly Ash, identified the applicable standard specification for fly ash (ASTM C618) and required that fly ash have a total equivalent alkali content of less than 1.5% if the contractor decided to include fly ash in the concrete mix. Specifically, paragraph 2.2.1.3 provided:

> ASTM C618, Class F, except that the maximum allowable loss on ignition must not exceed 3%. Class F fly ash for use in mitigating Alkali-Silica Reactivity must have a Calcium Oxide (CaO) content of less than 8% and a total equivalent alkali content less than 1.5%.

(JSF ¶ 116; R4, tab 5 at COE000373)

27. Contract specification SECTION 32 13 13.06, PORTLAND CEMENT CONCRETE PAVEMENT FOR ROADS AND SITE FACILITIES, identified certain

---

[2] ASTM (American Society for Testing and Materials), now known as ASTM International, is a "standards organization that develops and publishes voluntary consensus technical standards for a wide range of materials, products, systems, and services." *Trade West Constr., Inc.*, ASBCA No. 61068, 22-1 BCA ¶ 38,214 at 185,606 n.3 (quoting *Harry Pepper and Assoc., Inc.*, ASBCA No. 62038 *et al.*, 21-1 BCA ¶ 37,760 at 183,306 n.2).

7

publications which "form a part of this specification to the extent referenced" (R4, tab 5 at COE000556). Included was a reference to ACI 211.1, (1991; R 2009), Standard Practice for Selecting Proportions for Normal, Heavyweight and Mass Concrete (*id.*). ACI is an acronym for the American Concrete Institute International (R4, tab 5 at COE000556).

28. On April 5, 2018, BCI submitted to the government Transmittal No. 03 31 01.00 10-5 for concrete mix design specifying use of a "Durapoz Type F Fly Ash" (JSF ¶ 117; R4, tab 15 at COE0000003, COE000011). On April 26, 2018, the government disapproved the use of this concrete mix, stating as follows:

> Material certification for all concrete: All submitted material except for the fly ash are acceptable. Class F Fly Ash does not meet requirements for use in mitigation of Alkali-Silica Reactivity. Calcium Oxide (CaO) content exceed 8 percent, same with the total equivalent alkali content which is more than 1.5%. Please submit Class F Fly Ash source that meet requirements for use in mitigation of ASR as requested.

(JSF ¶ 118; R4, tab 15 at COE000004)

29. On April 5, 2018, BCI also submitted Transmittal No. 03 31 01.00 10-8 for cementitious materials and admixtures, regarding "Certification for Type II Portland Cement, Class F Fly Ash, type K Cement, admixtures" (R4, tab 16 at COE000002, COE000004). On April 26, 2018, the government disapproved use of Class F Fly Ash, stating it "does not meet requirements for use in mitigation of Alkali-Silica Reactivity. Calcium Oxide (CaO) content exceeds 8%, same with the total equivalent alkali content which is more than 1.5%" (*id.* at COE000002-03). The government's response stated also "[p]lease submit Class F Fly Ash source that meet requirements for use in mitigation of ASR as required by paragraph 2.2.1.3" (*id.*).

30. On May 7, 2018, BCI submitted a Request for Information Report (RFI) No. RFI-0021, stating that its subcontractor, Midwest Concrete Materials (MCM), "uses Durapoz F Class F fly ash that meets the USACE specification [section 32 13 14.13] for airfield pavements and has shown to mitigate ASR with every aggregated tested in the Midwest" (R4, tab 17 at COE000002). BCI recommended "that the Government approves use of Midwest Concrete Materials Durapoz F Class F fly ash, which has been proven time and time again to be extremely suitable for ASR mitigation" (*id.*). In its May 9, 2018, response to RFI-0021, the government noted that "specification 31 13 14.13 was not part of this contract" and stated that "Fly Ash used in your mix design shall meet the specified requirements. If the requirements cannot be met, Ground Granulated Blast-Furnace (GGBF) Slag can be used." (*Id.*)

8

31.  In his affidavit, Christopher Eichman, MCM Vice president, stated that at its Manhattan, Kansas, plant MCM utilized "a pozzolan other than fly ash and did not use raw or calcined natural pozzolan, silica fume, Ground Granulated Blast-Furnace (GGBF) slag, or any other slag," and MCM "could not substitute GGBF slag, another slag, silica fume, raw or calcined natural pozzolan, or another pozzolan for the fly ash for the concrete mix for BCI for the Tuttle Creek Project" (app. supp. R4, tab 45 (Feb. 14, 2023, aff. of Mr. Eichman ¶¶ 7-8)).  Mr. Eichman stated that MCM's plant "was serving multiple customers and had limited silo space for storage of other cementitious material . . . it was not possible to switch the concrete mix for one customer because it would have affected the production process for MCM's other customers who were using the concrete mix with fly ash" (*id.* at ¶ 8).  Although Mr. Eichman stated that he searched unsuccessfully for other fly ash, he does not state that MCM searched for GGBF slag or any other natural pozzolan that met the contract requirements (*id*. at ¶ 5).

32.  On June 1, 2018, BCI submitted to the government Transmittal No. 03 31 01.00 10-5.1 requesting "a variance regarding the concrete mix design submittal" (R4, tab 21 at COE000002, COE000009).  The variance request stated, in part:

> Per discussion with Corps representatives on 30MAY18, USACE designers recommended available alkali limits serve in lieu of specified Total Alkali limits.  BCI is submitting this variance for the specification paragraph "2.2.1.3 Fly Ash ASTM C618, Class F, except that the maximum allowable loss on ignition must not exceed 3%.  Class F fly ash for use in mitigating Alkali-Silica Reactivity must have a Calcium Oxide (CaO) content of less than 8% and a total equivalent alkali content less than 1.5%."

> BCI and our suppliers have provided numerous documents to this submittal to demonstrate that the available alkali content of the Durapoz Fly Ash is sufficient to prevent Alkali Silica Reactivity.  Past performance as well as current test results demonstrate strong performance in mix designs with the addition of this regional fly ash.  Additionally, the Durapoz F fly ash is run through a finish mill to increase the fineness and improve the ASR and strength reactivity, a process that is specifically done to provide stable and strong concrete.  Available alkali is water soluble alkali and is tested in accordance with ASTM C618 and C311.  We have attached an in-depth

9

report on the Durapoz ash that demonstrates the available alkali at 0.80%.

(*Id.* at COE000009)

33. On June 11, 2018, the government approved BCI's 5,000 PSI concrete mix design, stating that BCI must "[e]nsure that mix design use at least 25% of Fly Ash to suppress the fine aggregate ASR reaction in the combined mixture until proven otherwise" (R4, tab 21 at COE000002-03).

34. By letter dated June 25, 2018, BCI informed the government:

> BCI worked within specification requirements to provide a concrete mix design as requested. In the process of performing this effort BCI discovered that the requested fly ash requirements were not achievable for this area or region. BCI spent several weeks after submitting the original mix design (Ref. Transmittal 03 31 01.00-5) to try and achieve the specified Total Alkali for fly ash.
>
> After discovering the requested fly ash was not available BCI resubmitted the original mix design as a variation (Ref. Transmittal 03 31 01.00-5.1) which was subsequently approved. BCI feels the plans and specifications were defective in this section and the Total Alkali is not achievable with any fly ash known to BCI at [sic] its subcontractors.
>
> BCI has lost 21 days of schedule (7 days were time scheduled time off) and therefore we request a no cost extension to the contract end date of 14 days. BCI reserves its rights for schedule impacts for this impact.

(R4, tab 23 at COE000002)

35. By letter dated June 27, 2018, the government responded to appellant's June 25, 2018, letter, finding no merit to BCI's request. The government noted the unexplained seven-month period between issuance of the Notice to Proceed and BCI's concrete mix design submission, and that the government's response to RFI-0021 brought to BCI's "attention an option in the contract of using slag in your mix design in lieu of fly ash, of which you chose not to pursue" (R4, tab 24 at COE000002; JSF ¶ 119).

10

Winter Drawdown

36.  BCI's second complaint seeks $160,097.87, and a seven-day time extension, based upon alleged delay caused by the 2020 winter drawdown (compl. ¶ 101 dtd. March 28, 2022).

37.  Contract specification SECTION 01 12 00.00 23, SPECIAL PROJECT REQUIREMENTS INCLUDING DIVE OPERATIONS (R4, tab 5 at COE000088), paragraph 1.5.2, Lake Releases During Construction, stated:

> Releases through the outlet works are weather and inflow dependent.  Close coordination between the Tuttle Creek Operations Manager, Contracting Officer and the contractor is required.  A 3 day forecast for lake elevation and releases is updated daily and is available from the Tuttle Creek Operations Manager.  When there are no releases being made through the Tuttle Creek Outlet works, the tailwater elevation in the stilling basin is approximately elevation 1011.2 with the Rocky Ford gates closed and elevation 1007.5 with the Rocky Ford gates open and the tailwater pond drained.  The Rocky Ford gates will be open for no more than a total of 4 months for the duration of the project unless as approved by the contracting officer.

(R4, tab 5 at COE000092)

38.  Contract specification SECTION 01 12 00.00 23, paragraph 1.5.2.4.1, High Outlet Work Releases, provides:

> 1.5.2.4.1 High Outlet Works Releases
>
> The contractor shall not be considered impacted by outlet works releases occurring from the opposite stilling basin side as long as the tailwater plus wave elevation on the training wall side that work is being performed does not exceed 1022 during training wall demolition and replacement activities or any incidental work that would be directly impacted by high releases.
>
> Elevation 1022 shall be considered the location of the construction joint on the upper portion of the training wall that shall be removed and replaced.  Should the need arise

11

to make outlet works releases that will cause the tailwater plus wave elevation to exceed 1022, the government may direct the contractor to exit the impacted area until releases are reduced and the tailwater plus wave elevation will be below 1022 for work to resume. Features of work not impacted by high water elevation may continue as approved by the Contracting Officer.

(R4, tab 5 at COE000094-95)

39. By letter dated November 19, 2020, the government informed BCI:

As we have discussed, the Tuttle Creek Operations Project Office will be conducting releases for the winter draw down of Tuttle Creek Lake. The releases are anticipated to take approximately 10 days with a release of 3,000 cfs and will commence on the afternoon of Wednesday, 25 November 2020 or sooner if site conditions permit. We've coordinated the timing of the draw down with BCI to take advantage of BCI's planned long weekend to provide the least disruption and lower risk of lake freeze over. We acknowledge this impacts the critical path and do intend to issue a time modification.

This is not a suspension of work order. Work not affected by higher tail water in the stilling basin can and should continue.

(R4, tab 722 at COE000002)

40. By letter dated November 24, 2020, BCI responded to the government's letter regarding the winter drawdown, stating:

As acknowledged, this draw down will have an impact on critical path activities. No available non-concurrent work exists while monolith 11-12 excavations remain open and the winter draw down activities will impact all available work. BCI will suspend onsite activities until winter draw down and subsequent basin drawdown durations are complete. This approach will limit additional cost impacts related to this change.

12

Increasing water releases to 3,000 cfs will also inundate existing excavations for east/west monoliths 11-12 and in-process work. This impact will require additional work related to site restoration for both deep excavations and restoration of in-process work such as anchor bar holes, soil plugs and anchor installation platforms.

Serial Letter C-0083 indicates that approximately 10 days will be required for release activities. Specification section 01 12 00.00 23 (par. 1.5.2.2) also details that 4 days are required for dewatering of the stilling basin. Please advise when the winter draw down activities and required stilling basin drawdown will be completed so critical activities can continue. After completion of the still basin drawdown BCI will require several days to restore existing excavations and anchor installation platforms so work can continue.

(R4, tab 725 at COE000002)

41. By unilateral Modification No. A00015 dated March 11, 2021, the government granted a time extension totaling ten days for November 6, 2020, November 30, 2020, December 1 through December 5, 2020, and December 7 through December 9, 2020 (R4, tab 812 at COE000002-03). The modification was issued in accordance with FAR 52.249-10, with contract time extended for "adverse weather in excess of anticipated during the period 01 August 2019 through 14th of December 2020" (*id.* at COE000003).

42. To date, the government has granted a total time extension of 12 days for winter drawdown, which includes two days (November 24, 2020 and December 10, 2020) as set forth in the February 10, 2022, final decision (R4, tab 775 at COE000019), and ten days set forth in Modification No. A00015 (SOF ¶ 41; R4, tab 812 at COE000003). The remaining three days requested by BCI for winter drawdown are November 7, 2020, and December 11 and 12, 2020 (app. mot. at 12-13, 16; *see also* gov't opp'n at 47).

Excessive Seepage-Electrical Seep

43. BCI's first complaint seeks $34,390.27, and a 10-day time extension, based upon seepage of water into the project site (compl. ¶ 6 dtd. August 13, 2021).

44. The contract required BCI to partially demolish and rebuild training walls on both sides of the Tuttle Creek Stilling Basin (JSF ¶ 120; R4, tab 5 at COE000006).

13

45. Contract specification SECTION 31 00 00, EARTHWORK (R4, tab 5 at COE000470), paragraphs 3.1.2, Drainage, and 3.1.3, Dewatering, required the contractor to collect and dispose of surface and subsurface water encountered during construction (JSF ¶ 121; R4, tab 5 at COE000476). Paragraph 3.1.3 included the requirement that "[w]hile the excavation is open, maintain the water level continuously, at least 4 feet below the working level" and provided that "[g]roundwater sources include, but are not limited to dam foundation underseepage, seepage through the abutments, tail water in the stilling basin, and precipitation infiltration" (JSF ¶¶ 121-22; R4, tab 5 at COE000476).

46. During performance, BCI utilized pumps in its efforts to comply with the contract's water level requirements (JSF ¶ 123; R4, tab 79 at COE000004-05; (gov't mot. ex. G (dep. of Gerald R. Miller 106:1-107:9))).

47. The "excessive seepage" experienced by BCI occurred only on the west side of the stilling basin (JSF ¶ 124; gov't mot. ex. G (dep. of Gerald R. Miller at 104:14-18)), coming from a hillside outside the project's construction limits (*id.* at 103:24-104:13).

48. The excessive seepage was caused by a buried electric line installed by another contractor in 2016 for the electric utility company that owns the line (JSF ¶ 125; gov't ex. H (dep. of Brian McNulty at 44:3-17, 48:4-7)).

49. The parties agree that the "electrical seep" existed at the time of the pre-bid site visit, as the ground at that location was moist (app. additional material facts dated Feb. 24, 2023, at 20 (¶ 96); gov't reply at 22-23 (¶ 96)). At the time of the pre-bid site visit, a pile of wet rock was located on the west side of the stilling basin (JSF ¶ 126; R4, tab 4 at COE000009-10, COE000018 (ex. B ("Image B.1: Pre-Bid Site Investigation, wet piled rock to cover the spot where seepage had started")).

50. Mr. McCarn stated in his deposition that at the time of the pre-bid site visit the "area was moist on the ground. There was a pile of rock there to try and help to spread out for the area that kept getting saturated and vegetation was bright green in the corner of the post than the rest of the vegetation in that area." (JSF ¶ 126; app. opp'n ex. (dep. of Nathan L. McCarn at 108: 18-25)).

51. BCI's Pre-Construction Site Survey, conducted in January 2018, included the following statement under the title Damaged structures:

> There is also standing water in the northwest corner of the
> project area. It appears water is seeping or draining from
> above or within the rock layers that slope into the basin

area. It is BCI's understanding that the USACE is monitoring this water pool and may maintain the area and clear it of vegetation to see that the water seepage does not drastically increase. This water should not impact the project unless quantity increases or if USACE deems additional measures need to be taken once west side excavation occurs and exposes water seepage.

(JSF ¶ 127; R4, tab 1150 at COE000003)

52. The parties stipulate that BCI performed work on the project for a year before experiencing any issue with water from the electrical seep, which appellant states began on April 25, or April 27, 2019 (gov't mot. at 8 (citing ex. E (dep. of Torrey Crossman at 165:14 - 166:9 and 179:22 - 180:4)); JSF ¶ 128; app. additional material facts dated Feb. 24, 2023, at 14 (¶ 62); gov't reply at 16 (¶ 62)). Calculated from the date of contract mobilization (March 20, 2018), over 13 months passed before BCI began experiencing problems caused by the electrical seep (SOF ¶ 16). From the date of contract award (July 28, 2017) and issuance of the Notice to Proceed two weeks later (August 10, 2017), approximately 21 months passed before BCI began experiencing problems caused by the electrical seep (SOF ¶¶ 13, 15).

53. BCI's April 27, 2019, QCR contains the first written documentation of water "flowing" from the electric line and impacting project work. As set forth in the QCR, in the project's northwest corner a container had to be moved when water seeped "quite heavily into that area." The seep was intermittent in that it "would stop for several minutes, then would begin leaking again . . . on and off." (JSF ¶ 129; R4, tab 128 at COE000178)

54. Mr. McCarn noted in a Quality Assurance Report dated May 6, 2019, that: "BCI is claiming a differing site condition and delay due to water coming in from a seep that has been there since before the project started. This is not correct. They are also claiming a DSC for hitting a 4" drain line that is shown on CD101 and CG201." (JSF ¶ 130; *see also* R4, tab 128 at COE000178)

COVID-19 Delays

55. BCI's second complaint seeks $154,538.84, and an 89-day time extension, based upon alleged delay caused in 2020 by the COVID-19 pandemic (compl. ¶ 75 dtd. March 28, 2022).

56. On January 23, 2018, BCI subcontracted with Nicholson Construction Company (Nicholson) to provide labor, materials, work, tools, equipment, supervision, and services to fully perform and complete all post-tensioned concrete anchor work on

the project (JSF ¶ 131; compl. ¶¶ 68-69 dtd. March 28, 2022; *see* R4, tab 5 at COE000409 (describing work post-tensioned concrete anchor work)).

57. BCI continued to work on the project after issuance of the President's Proclamation 9994 of March 13, 2020, Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (JSF ¶ 136; gov't mot. ex. G (dep. of Gerald R. Miller at 202:8-16)).

58. On March 16, 2020, Nicholson issued a memo to its employees setting forth "Travel Options due to COVID-19," wherein Nicholson provided "a compensation package to personnel that would rather not travel by plane or not travel home at all and remain on site" (R4, tab 1191 at COE000002).

59. By email dated March 18, 2020, Jarell Han, Nicholson's Project Manager, provided Dave Saxton, BCI's Project Manager, with Nicholson's "work schedule for drawdown," indicating that Nicholson planned to remobilize at the site beginning March 30, 2020, and that setup and work would resume on April 1, 2020 (JSF ¶ 132; R4, tab 1134; gov't opp'n. ex. K (dep. Dave Saxton at 6:21-7:6 (indicating Mr. Saxton was BCI's Project Manager))). Regarding concerns about COVID-19, Mr. Han requested that Nicholson be informed in the event the government "is anticipating a shutdown that would impact our work at Tuttle before we remobilize on Mar 30" (R4, tab 1134).

60. By letter dated March 20, 2020, the government requested "BCl's response to COVID-19 with relation to this contract and in compliance with Center for Disease Control (CDC) recommendations," noting that BCI was "not being directed to take any action in response to this pandemic," and that "a discussion of your intended plan is requested" (R4, tab 694 at COE000002). The government requested BCI provide its "policy to protect employees regarding work, travel, etc. during COVID-19," and state how its policy would be implemented regarding its contract and subcontract work, as well as measures BCI "anticipate[s] for continuation of work, site maintenance, etc." in the event onsite BCI team members or subcontractor team members are quarantined (*id.*).

61. By letter dated March 23, 2020, BCI responded to the government's March 20, 2023, inquiry stating BCI is "following the KDHE [Kansas Department of Health and Environment] travel recommendations and quarantine mandate released March 18th, 2020," and that in the event a workplace member receives "notification for a positive test or notification of close contact of a confirmed case[,] a 14-day quarantine will be observed as recommended" (R4, tab 695 at CPE000002). BCI's letter also stated "[i]n the event the entire onsite crew is unable to work BCI would bring additional personnel to site in order to maintain existing excavations as required" (*id.*). Included with BCI's response was a letter from Nicholson, stating "[w]e are

providing notice to BCI Construction and USACE to let them know that the COVID-19 pandemic could soon impact their construction schedule," and that "[a] suspension of work may soon be in order, as well as an extension of time to complete the project" (*id.* at COE000006).

62. By letter dated March 26, 2020, the government informed BCI that the contract is considered mission essential and that BCI was "to continue contract performance to the maximum extent practicable, while also heeding warnings and taking appropriate steps to protect the health of your and your subcontractors' employees" (R4, tab 696 at COE000002). The government requested that BCI keep it informed of its actions to perform the contract, efforts to comply with state declarations and directives, and "potential impacts this dual compliance may have on your operations" (*id.*). The government also requested that BCI "pass along any relevant information received from your subcontractors," including "[p]erformance delays, material shortages, or any other impacts that may arise due to subcontractors' efforts to comply with state declarations and directives" (*id.*).

63. As of April 1, 2020, Nicholson was back onsite and performing work (JSF ¶ 133; gov't mot. ex. A (dep. of Jarell Han at 145:21-146:4)).

64. The government issued no directives on this project in response to the COVID-19 pandemic about methods of travel (airplanes, driving) or rotating crews (JSF ¶ 134; gov't mot. ex. A (dep. of Jarell Han at 146:5-147:21)).

65. The government did not direct Nicholson to draft or develop the "travel options" the company issued to its employees (JSF ¶ 135; R4, tab 1191; SOF ¶ 58).

66. The project did not experience an outbreak of COVID-19 during contract performance (JSF ¶ 137; gov't mot. ex. G (dep. of Gerald R. Miller 202:25 - 204:4)).

67. By letter dated February 11, 2021, BCI alleged it experienced 59 days of delay in delivery of materials from Oldcastle Infrastructure due to COVID-19 production issues that impacted critical path activities (R4, tab 747; app. opp'n at 67). The parties offer divergent interpretations of BCI employee Brian Butler's deposition testimony regarding supply issues BCI experienced in obtaining manhole covers supplied by Oldcastle Infrastructure and the supply issue's alleged impact upon the project (app. additional material facts dated Feb. 24, 2023, at 40 (¶ 168) (citing app. reply ex. K (dep. of Brian Butler at 188, 190-91); gov't reply at 48 (¶ 168)). BCI argues that Mr. Butler testified he placed the order for manhole covers in July 2020 and that BCI experienced a delay in receiving those manholes from Oldcastle (app. additional material facts dated Feb. 24, 2023, at 40-41 (¶¶ 169-70) (citing app. reply ex. K (dep. of Brian Butler at 193-96))). In contrast, the government states that Mr. Butler also testified that it was possible to order the manholes in 2018 after the

17

government approved the relevant transmittal for these materials and that some delay in 2020 was caused because some of the materials were damaged in transit (gov't reply at 48 (¶ 169)).

68.  Although BCI's February 11, 2021, letter, does not request any additional costs based upon the alleged 59-day delay in receiving the manhole covers (R4, tab 747), BCI's December 12, 2021, certified claim seeks additional labor and equipment costs for "BCI Onsite Rentals Per Day Rate" and "BCI Operated equipment," totaling $55,999.94, plus an additional $1,530.09 for "Bond" (R4, tab 773 at COE000445 (ex. 66)).

69.  BCI requested a 30-day time extension and $97,008.81 for increased labor and material costs based upon pass through claims brought on behalf of its subcontractor Nicholson (compl. ¶¶ 63-85 dtd. March 28, 2022; R4, tab 747 at COE000002, tab 773 at COE000044).  Although BCI alleged that Nicholson experienced a 30-day delay because of COVID-19, documents produced by Nicholson, and testimony of Nicholson employees, indicate that Nicholson sought only a 14-day time extension (R4, tab 773 at COE000341-42; gov't mot. ex. A (dep. of Jarell Han at 144:15–22, 147:4–21); gov't mot. ex B (dep. of Joseph McCune at 63:3–65:22)).

Riprap

70.  BCI's second complaint seeks $30,489.49, based upon alleged extra work involving placement of riprap (compl. ¶ 111 dtd. March 28, 2022).

71.  The contract specifications included paragraph 3.5, PLACEMENT OF RIPRAP, and paragraph 3.6, PLACEMENT OF GROUTED RIPRAP, which detailed the location and method the contractor was to utilize to place riprap and grouted riprap at the project site (R4, tab 5 at COE000646-48).

72.  IFB Amendment No. 0003 included the following question and response regarding riprap:

> **Question 2.**  We are attempting to determine the extent of riprap protection required in this project:  Page CD101, D9 indicates 4.5' riprap over 1' of bedding.  It is not clear whether the existing grouted riprap is to be removed and new riprap in its place or new bedding and riprap added to the existing structure.  The length and depth of the new riprap is also unclear.
>
> **Response:**  The existing grouted riprap (exposed on the river banks) is not to be removed.  The riprap that is

removed and replaced as indicated on CD101 detail D9 is
what is buried on the landward side of the stilling basin
training walls. The bottom elevation, top elevation with
horizontal and vertical slopes are provided to calculate the
amount of material required.

(JSF ¶¶ 138-139; R4, tab 10 at COE000003)

73. Amendment No. 0003, dated June 19, 2017, was issued after the pre-bid
site visit on May 26, 2017, and before BCI's submission of its bid on June 22, 2017
(SOF ¶¶ 12, 72; JSF ¶ 140; R4, tab 10 at COE000002, tab 12 at COE000003 (setting
forth "Offer date")). BCI acknowledged receipt of Amendment No. 0003, as reflected
in the contract (block 19) (JSF ¶ 141; R4, tab 12 at COE000003).

74. Contract specification SECTION 01 11 00, SUMMARY OF WORK (R4,
tab 5 at COE000084), included paragraph 1.3, EXISTING WORK, which required the
contractor to "[r]emove or alter existing work in such a manner as to prevent injury or
damage to any portions of the existing work which remain," and to "[r]epair or replace
portions of existing work which have been altered during construction operations to
match existing or adjoining work, as approved by the Contracting Officer" (*id.*
at COE000086).

75. Contract drawing CD101, DEMOLITION PLAN, included Detail No. D9,
MONOTLITHS 11/12 REMOVAL & BACKFILL SECTION, depicting
"DISTURBED STRATA" and "UNDISTURBED STATA," both of which included
"PERVIOUS BACKFILL, IMPERVIOUS FILL, BEDDING, AND RIPRAP" (R4,
tab 6 at COE000013). Drawing CD101 included a NOTE for DISTURBED STRATA
stating, "REPLACE DISTURBED STRATA WITH SPECIFIED MATERIAL AND
AT SAME LOCATION AS EXISTING" (*id.*).

76. The contract incorporated by reference FAR 52.236-3 Site Investigation
and Conditions Affecting the Work (APR 1984) and FAR 52.236-9 Protection of
Existing Vegetation, Structures, Equipment, Utilities, and Improvements (APR 1984)
(R4, tab 12 at COE000012). FAR 52.236-3(a) states that "[t]he Contractor
acknowledges that it has taken steps reasonably necessary to ascertain the nature and
location of the work, and that it has investigated and satisfied itself as to the general
and local conditions which can affect the work or its cost," and that "[a]ny failure of
the Contractor to take the actions described and acknowledged in this paragraph will
not relieve the Contractor from responsibility for estimating properly the difficulty and
cost of successfully performing the work, or for proceeding to successfully perform
the work without additional expense to the Government." 48 C.F.R. § 52.236-3.
FAR 52.236-9(b) states that "[t]he Contractor shall protect from damage all existing
improvements and utilities (1) at or near the work site and (2) on adjacent property of a

third party, the locations of which are made known to or should be known by the Contractor," and that "[t]he Contractor shall repair any damage to those facilities, including those that are the property of a third party, resulting from failure to comply with the requirements of this contract or failure to exercise reasonable care in performing the work." 48 C.F.R. § 52.236-9.

77. BCI asserts that prior to beginning construction on the upper training wall, it determined that the existing riprap at Monolith 12L and 12R exceeded the Monolith joint where concrete removal and placement was to occur (app. additional material facts dated Feb. 24, 2023, at 26 (¶ 120) (citing app. opp. ex. (Feb. 24, 2023, aff. of Mr. Miller ¶ 28))). The government does not contest the proposition that existing riprap exceeded the Monolith joint where concrete removal and placement was to occur (app. additional material facts dated Feb. 24, 2023, at 26 (¶ 120); gov't reply at 29 (¶ 120)). BCI also asserts that it "could not complete its contract work without removing some of the grouted rip rap" (app. additional material facts dated Feb. 24, 2023, at 26 (¶ 120)). The government denies that contract work could not be completed without removing some of the grouted riprap (*id.*); gov't reply at 29 (¶ 120)). BCI states that the administrative contracting officer "thought that the concrete wall could be demolished without removing the rip rap by using shoring" (app. additional material facts dated Feb. 24, 2023, at 27 (¶ 124)) (citing app. opp'n ex. (dep. of Allen E. Ewell at 125-26)).

78. BCI submitted to the government a Request for Proposal (RFP) dated November 17, 2018, for shoreline "Rip Rap associated costs" (R4, tab 690 at COE000002; *see also id.* at COE000004). The RFP was submitted over a year after the July 28, 2017, contract award date (SOF ¶ 52). Regarding the "Information Requested," BCI stated:

> BCI is requesting the government formally provide the extent of rip rap in the vicinity of station 8+60 to 8+80, adjacent to Monoliths 12L and 12R. Please include the amount to be removed, installed, and grouted in place on the riverside shoreline. We would also like clarification on the depth of placement for both the rip rap and bedding material.

(R4, tab 690 at COE000004) The RFP contains no assertion that the required work was impossible to perform without removing the shoreline riprap (*id.* at COE000002-04).

79. A letter accompanying BCI's RFP suggests that BCI was the bidder who submitted the question set forth in Amendment No. 0003, stating "[i]n the bidding phase of the contract (19JUN17), BCI specifically requested the extent of rip rap

20

protection to ensure proper estimating of the contract as well as for planning purposes," and that "[t]he government responded that no rip rap on the shoreline was to be removed, and that the only rip rap to be removed and replaced was behind the landward side of the training walls" (R4, tab 690 at COE000002).

80. The government responded to BCI's RFP on November 20, 2018, declining BCI's request and stating that BCI had "removed rip rap that was to remain in place" (JSF ¶ 142; R4, tab 691 at COE000002). The government's response referenced the requirements set forth in FAR 52.236-3 and FAR 52.236-9 (*see* SOF ¶ 76), as well as contract specification SECTION 01 11 00, paragraph 1.3 (*id.* at COE000002-03; *see also* SOF ¶ 74). The government's response also acknowledged "that, as stated in your letter, during bidding you asked for the extent of rip rap protection required in the project" (R4, tab 691 at COE000002).

81. On June 6, 2019, BCI submitted to the government a Request for Equitable Adjustment (REA) H-0040 seeking compensation for reinstalling grouted riverbank riprap that it had removed (R4, tab 692; JSF ¶ 143).

Sidewalk Placement

82. BCI's second complaint seeks $28,133.54, and a seven-day time extension, for additional sidewalk placement work (compl. ¶ 62 dtd. March 28, 2022).

83. The original contract drawings detailed work regarding the construction of sidewalks at the project site (R4, tab 6 at COE00021, COE00023). Pursuant to Modification No. A00013/R00020 (with an effective date of November 18, 2020), the government issued revised drawings requiring installation of a thickened slab for certain sidewalks (R4, tab 622 at COE00002, tab 721 at COE00002-03).

84. By RFI-0055, dated September 30, 2020, BCI requested that the government confirm its sidewalk design, which BCI stated did not provide any relief for concrete contraction (R4, tab 715 at COE00002, tab 733 at COE00002). BCI included a layout detailing recommended contraction joint and expansion joint locations, including detail for those joints (*id.*). By letter dated December 3, 2020, the government informed BCI that it did not agree that joints for the concrete sidewalk were not within the scope of work (R4, tab 731 at COE000002).

85. The parties now agree that neither the original nor revised contract drawings required installation of sidewalk expansion joints (JSF ¶ 52).

Liquidated Damages

86. By letter dated July 23, 2020, the government informed BCI that "[p]ursuant to clause 52.211-12, 'Liquidated Damages-Construction', an amount of $860.00 for each calendar day of delay will be held for liquidated damages to the [g]overnment . . . beginning on July 12th, 2020" (R4, tab 1223 at COE000002). The government's letter noted that the contractual project completion date was July 11, 2020, and that BCI's latest schedule indicated it would not complete the project until December 2020 (*id.*).

87. By letter dated September 9, 2020, BCI responded to the government's July 23, 2020, letter, challenging the government's assessment of liquidated damages as "unwarranted, unnecessary and without justifiable cause" (R4, tab 150 at COE000002).

88. Pursuant to Pay Estimate No. 45, as of April 24, 2021, the project was 95.3 percent complete (R4, tab 755 at COE000002; app. additional material facts dated Feb. 24, 2023, at 45 (¶ 184); gov't reply at 54 (¶ 184)).

89. By letter dated June 16, 2021, the government issued Serial Letter C-0102, listing 104 items that had yet to be completed on the project (R4, tab 814; gov't opp'n. at 19 (¶ 16); app. reply to gov't additional facts, dated March 24, 2023, at 56 (¶ 16)). Work identified by the government included "completing repairs on the top of the stilling basin's walls, electric work, and reinstallation of the grouted riprap along the riverbanks" (gov't opp'n at 19 (¶ 17); app. reply to gov't additional facts, dated March 24, 2023, at 56 (¶ 17); *see generally* R4, tab 814).

Project Acceptance/Assessment of Liquidated Damages

90. By letter dated July 15, 2021, the government accepted a portion of the project work (R4, tab 815; gov't opp'n at 19 (¶ 20); app. reply to gov't additional facts, dated March 24, 2023, at 57-58 (¶ 20)). Work identified by the government that remained included grouted riprap and conduit support for PVC conduit used in connection with a manometer well (R4, tab 815; gov't opp'n at 19-20 (¶ 21); app. reply to gov't additional facts, dated March 24, 2023, at 58 (¶ 21)).

91. By letter dated July 19, 2021, the government confirmed that "the project was accepted for and on behalf of the Contracting Officer, Matthew Wilson as of July 15, 2021[,] with the following deficiencies" (JSF ¶ 114; R4, tab 815 at COE000002). The letter listed 26 deficiencies in the following areas of the project site: West Entrance, West Side Roadway, West Side Stilling Basin, Headwall, East Side Stilling Basin, East Side Roadway, East Entrance, East Parking Lot Lay Down Areas and Stockpile Area, and General (R4, tab 815 at COE000002-03).

92. By letter dated September 16, 2021, BCI requested "release of all liquidated damages for days beyond April 23, 2021. Regarding additional liquidated damages being withheld, BCI stated: "[w]hile BCI disagrees with the Government's withholding of all liquidated damages, which currently totals $228,760 for the period from Pay Request 25, (work starting on June 25, 2020) through Pay Request 48 (work ending on July 23, 2021), BCI will address the total amount being withheld by the Government in a separate letter" (R4, tab 1222 at COE000002).

93. By letter dated September 28, 2021, the government addressed BCI's request for release of liquidated damages, noting that a substantial function of the Stilling Basin Area is for public recreation and access to the rest of the park," and that "[a]s of April 23, 2021, there were several incomplete activities that would not have allowed for transfer of the project for this function" (R4, tab 1037 at COE000002-03). The government stated that incomplete activities included "approval of the anchor testing results, asphalt pavement, concrete sidewalk placement, installation of handrails and the anti-scaling fence, as well as site restoration and completion of deficiencies" (*id.*).

94. The parties' JSF states that the government currently is withholding $228,760, in liquidated damages at the rate of $860 per day for 266 days for the period of October 22, 2020, to July 15, 2021 (JSF ¶ 4 (citing R4, tab 775 at COE000023)).

95. The liquidated damages rate of $860 is 0.01 percent (1/100 of one percent) of the total contract price of $8,261,206 (SOF ¶ 13).

BCI Equipment Standby Costs and Contracting Officer Final Decision

96. By letter dated March 12, 2020, BCI submitted a proposal in the amount of $75,711.23, for equipment standby costs for the period of November 1, 2019, through January 20, 2020 (R4, tab 52 at COE000002). By letter dated April 20, 2020, the government informed BCI that it found no "merit in the proposed costs," as they were "attributable only to contractor action or inaction" (R4, tab 53 at COE000002).

97. By letter dated May 22, 2020, BCI again addressed its request for equipment standby costs for the period of November 1, 2019, to January 20, 2020 (R4, tab 54 at COE000002).

98. By letter dated June 22, 2020, the contracting officer issued a letter in response to BCI's March 12, 2020, and May 22, 2020, letters regarding the issue of equipment standby costs as well as other issues (R4, tab 57 at COE000002). The contracting officer's letter concluded, stating:

The above mentioned items are my final decision. If BCI Construction USA, Inc. desires to pursue any further requests for relief, cost adjustment, contract modification, etc. please proceed in accordance with the Disputes Clause incorporated into the contract, FAR 52.233-1. We look forward to continuing the current progress and completing this project.

(R4, tab 57 at COE000003)

### August 26, 2020, Notice of Appeal

99.  On August 26, 2020, BCI filed with the Board a notice of appeal of the contracting officer's June 22, 2020, letter.  BCI stated that although its May 22, 2020, letter did not request a final decision, the contracting officer's letter in response referenced it as a "final decision" of the contracting officer.  That appeal was docketed as ASBCA No. 62657.[3]

### BCI's January 25, 2021, Claim, and Contracting Officer Final Decision

100.  By letter dated January 25, 2021, BCI submitted a claim seeking 101 additional days for alleged delays and reimbursement totaling $193,159.93, relating to (1) supply of Ready-mix concrete based upon alleged defective specification (21 days) in the amount of $25,856.59, (2) REA H-0042, for alleged excessive seep (10 days) in the amount of $34,390.27, (3) REA H-0054, for alleged equipment standby (80 days) in the amount  $78,386.42, and (4) REA H-0063 – rebar inspection and cleaning of holes (14 days) in the amount of $54,526.65 (R4, tab 3).  BCI's January 26, 2021, claim included the equipment standby costs referenced BCI's March 12, 2020, submission (*id.*) (*see* SOF ¶ 96).

101.  By letter dated June 10, 2021, the contracting officer issued a final decision denying the majority of BCI's claim (R4, tab 4).  The final decision found "partial merit of the 'Equipment Standby Costs for November 1, 2019 to January 20, 2020' item," and extended the contract completion date by 56 calendar days but did not award additional costs (*id.* at COE000002, COE000010-11).

102.  Regarding appellant's excessive seepage claim, the contracting officer stated:

---

[3] At the request of the parties, the Board stayed proceedings in ASBCA No. 62657 from September 24, 2020, to July 29, 2021, during which time BCI submitted, and the government considered, what became BCI's January 25, 2021, claim.

24

> The volume of water on the west side was exasperated by the actions of BCI documented in Exhibit D. Once the excavation was opened, BCI started digging to install a temporary pump and then cut through a 4" seep drain that would have handled the seepage from the west corner. BCI also placed their grout cleanout area over the drain line which then blocked the flow into the severed seep drain.

(R4, tab 4 at COE000010)[4]

### July 7, 2021, Notice of Appeal

103. On July 7, 2021, BCI filed with the Board a notice of appeal of the contracting officer's June 10, 2021, final decision. By notice dated July 15, 2021, the Board docketed that appeal as ASBCA No. 62975, and consolidated it with ASBCA No. 62657.

### BCI's December 12, 2021, Certified Claim

104. By letter dated December 12, 2021, BCI submitted a certified claim based upon: material cost increases; a differing site condition for backfill materials; sidewalk joint placement; COVID-19 delays; winter drawdown delays; reinstallation of riverbank riprap; and payment of the contract balance, including remission of liquidated damages (R4, tab 773).

### BCI's January 28, 2022, Amended Certified Claim and Contracting Officer's Final Decision

105. By letter dated January 28, 2022, BCI submitted an amended certified claim, seeking an increase in the contract price of $517,449.60 and a time extension of 103 days for the six items identified in SOF ¶ 104, plus $228,760 for the unpaid contract balance and remission of liquidated damages, totaling $746,209.60 (R4, tab 774 at COE000002-03; *see also* R4, tab 775 at COE000004, with a summary of BCI's claim). BCI's claim also challenged the reasonableness of the government's liquidated damages calculation (R4, tab 774 at COE000035).

106. By letter dated February 10, 2022, the contracting officer issued a final decision on BCI's January 28, 2022, certified claim (R4, tab 775 at COE000002). The

---

[4] Exhibit D is an exhibit attached to the final decision which consists of "Photographic documentation of cut 4" line and grout cleanout rerouting seepage" (R4, tab 4 at COE000008, COE000020).

25

final decision included the following summary of appellant's January 28, 2022 claim: (1) increased material costs ($120,356.70); (2) increased backfill material costs ($54,322.65); (3) sidewalk placement ($28,133.54) (seven day time extension); (4) COVID-19 delays ($154,538.84) (89 day time extension); (5) winter drawdown ($160,097.87) seven day time extension; (6) riprap ($30,489.49), and (7) payment of contract balance (return of liquidated damages) ($228,760) (*id.* at COE000004).

107. The final decision found partial merit to the winter drawdown delay claim, awarding a no-cost, two calendar-day time extension (R4, tab 775 at COE000018). The final decision stated, in part:

> The cause of the winter drawdown is weather, as drawdowns vary dependent on weather, inflows and temperatures. FAR 52.249-10, Default (Fixed-Price Construction), includes but is not limited to weather. Delays experienced under this clause are considered excusable but noncompensable. This clause does not authorize monetary damages as the delay source was not the Government. Winter drawdown events are outside of the control of both the contractor and the Government, and therefore the request for a $160,097.87 price increase because of winter drawdown delays is denied.

(*Id.* at COE000020) The final decision granted BCI an increase in material costs of $37,872, an increase for backfill materials of $3,201, and a two-day extension of the contract completion date which resulted in remittance of assessed liquidated damages in the amount of $1,720 (plus interest) (*id.* at COE000002).

### February 17, 2022, Notice of Appeal

108. On February 17, 2022, BCI filed with the Board a notice of appeal of the contracting officer's February 10, 2022, final decision. By notice dated July 15, 2021, the Board docketed that appeal as ASBCA No. 63200, and consolidated it with ASBCA Nos. 62657 and 62975.

### Recent Contract Modification Awarding BCI Additional Compensation and Contract Performance Days

109. In response to BCI's motion for partial summary judgment, the government states that it "agrees to entitlement as to the sidewalk isolation joints and sealant claim," but disputes quantum, and that it "will issue a unilateral modification for the sidewalk isolation joints and sealant claim" (gov't opp'n at 1). On March 16, 2023, the government issued unilateral Modification No. R00026, awarding BCI

26

additional costs for the installation of isolation joints and sealing on the sidewalk ($24,559.11), rebar inspection and cleaning of anchor holes (SOF ¶ 100) ($30,000), and equipment standby costs incurred from November 1, 2019, to December 23, 2019 (SOF ¶ 96) ($51,082.55), for a total amount of $105,641.66 (gov't reply ex. PP at 1-2). The government also added a total of 14 days to the contract completion date based upon the sidewalk placement claim (seven days) and the rebar inspection and cleaning of holes claim (seven days) (*id.* at 2).

## DECISION

### I. Standard of Review

"Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *First Commerce Corp. v. United States*, 335 F.3d 1373, 1379 (Fed. Cir. 2003); FED. R. CIV. P. 56(a). The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed. Cir. 1998). A party challenging a motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank or Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). It does not matter that the parties have cross-moved for summary judgment, both claiming that there exists no material issue of fact. "Each cross-motion is evaluated separately on its merits, and all reasonable inferences are drawn in favor of the defending party." *Osborne Constr. Co.*, ASBCA No. 55030, 09-1 BCA ¶ 34,083 at 168,513. The Board is not bound to "grant judgment as a matter of law for one side or the other." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

### II. Contentions of the Parties[5]

The government's motion seeks summary judgment on the following claims: (1) BCI's challenge to the liquidated damages daily rate as unreasonable as set forth in BCI's second complaint (compl. dtd. March 28, 2022) (gov't mot. at 36); (2) BCI's

---

[5] Neither party seeks summary judgment on the following BCI claims: (1) H-0054 - REA Equipment Standby (80 days) $78,386.42, (2) H-0063 - Rebar Inspection & Cleaning of Holes (14 days) $54,526.65 (both set forth in appellant's first complaint (compl. ¶ 6 dtd. August 13, 2021)), and (3) backfill material (no time) $54,322.65) (set forth in appellant's second complaint (compl. ¶ 39 dtd. March 28, 2022)). We note, however, that Modification No. R00026 awarded BCI additional equipment standby costs, as well as additional time and costs for rebar inspection and cleaning of anchor holes (SOF ¶ 100).

27

Ready-mix concrete, defective specification claim set forth in BCI's first complaint (compl. dtd. August 13, 2021) (gov't mot. at 15); (3) BCI's excessive seepage claim set forth in BCI's first complaint (compl. dtd. August 13, 2021) (gov't mot. at 20), (4) BCI's COVID-19 delay claim set forth in BCI's second complaint (compl. dtd. March 28, 2022) (gov't mot. at 26), and (5) BCI's riprap claim set forth in BCI's second complaint (compl. dtd. March 28, 2022) (gov't mot. at 33).

BCI's partial motion seeks summary judgment on the following claims: (1) BCI's request for remittance of liquidated damages set forth in its second complaint (compl. dtd. March 28, 2022) (app. mot. at 2), (2) BCI's sidewalk placement claim set forth in its second complaint (compl. dtd. March 28, 2022) (app. mot. at 16), and (3) BCI's winter drawdown claim set forth in its second complaint (compl. dtd. March 28, 2022) (app. mot. at 12). BCI also challenges the government's affirmative defense of accord and satisfaction on BCI's material cost claim (Modification Nos. R00014, R00016, and R00018), BCI's sidewalk placement claim (Modification No. R000020), and BCI's winter drawdown (Modification No. R00021) (second complaint (compl. dtd. March 28, 2022)) (app. mot. at 20) (ans. dtd. September 10, 2021 at 20, ans. dtd. July 29, 2022 at 27).

Both parties seek summary judgment on various issues regarding the government's assessment of liquidated damages. Accordingly, we address first BCI's challenge to the government's assessment of liquidated damages. We then address issues raised by the government's motion for partial summary judgment, followed by issues raised by appellant's motion for partial summary judgment.

III.  Remittance of Liquidated Damages

BCI seeks remission of liquidated damages, which is a government claim. *Sauer, Inc.*, ASBCA No. 62395, 21-1 BCA ¶ 37,845 at 183,753, recon. denied, 22-1 BCA ¶ 38,079. Accordingly, "the Government bears the initial burden of proving that the contractor failed to meet the contract completion date and that the period of time for which it assessed liquidated damages is correct.'" *KEMRON Envtl. Servs. Corp.*, ASBCA No. 51536, 00-1 BCA ¶ 30,664 at 151,399). To determine the enforceability of a liquidated damages clause, the Board examines whether the liquidated damages amount "is not so extravagant, or disproportionate to the amount of property loss, as to show that compensation was not the object aimed at or as to imply fraud, mistake, circumvention or oppression." *DJ Mfg. Corp. v. United States*, 86 F.3d 1130, 1133 (Fed. Cir. 1996) (quoting *Wise v. United States*, 249 U.S. 361, 365 (1919)).

A.  BCI did not Waive its Right to Challenge the Liquidated Damages Rate

The government argues that by failing to raise the issue prior to contract award BCI waived its right to challenge the actual liquidated damages rate set forth in the

contract (gov't mot. at 37-38).  As support for its proposition, the government cites *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007).  In that case, the Federal Circuit held that an incumbent contractor who failed to lodge a bid protest pre-award regarding terms of the solicitation (the applicability of the Service Contract Act, 41 U.S.C. §§ 351–358) waived its right after award to challenge those terms.  It seems readily apparent that the waiver doctrine espoused by the Federal Circuit in *Blue & Gold* has no real application here.  In that decision, the appeals court held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  492 F.3d at 1313.  In so holding, the court expressed concern about the "inefficient and costly" process of having to rebid an invitation for bids or submit additional offers on a solicitation "after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation."  *Id*. at 1314 (quoting *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 175 n.14 (2005).

The concern expressed by the Federal Circuit in *Blue & Gold* simply does not exist in this appeal, nor can it be said that the IFB here contained a patent ambiguity regarding the liquidated damages rate.  Here BCI did not waive its right to challenge the actual liquidated damages rate by not challenging the rate prior to submitting its bid, as there was no "patent error" of which BCI was aware at the time it submitted its bid.  Indeed, there is no allegation that BCI had any knowledge of what it believed might be in error regarding the liquidated damages amount set forth in the IFB.

The government cites our decision in *Assist Consultants, Inc.*, ASBCA No. 61525, 21-1 BCA ¶ 37,850 at 183,807, for the proposition that "[t]he waiver rule 'applies to *all situations* in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so" (gov't mot. at 37) (emphasis supplied by government).  However, that appeal, unlike the situation here, involved an issue of which the contractor was aware pre-award.  Specifically, the solicitation (and a previous contract awarded to the contractor) contained a FAR provision that set certain limitations on the type of surety permitted to submit performance and payment bonds under the contract; yet the contractor took the position, post award, that a FAR provision not incorporated into the contract allegedly allowed the contractor to utilize a surety not otherwise permitted.  *Id*.  We held that "ACI waived this argument by not raising it prior to award of the contract," and that this was "especially true here, where ACI was aware based on the -0010 contract that the contracting officer intended to enforce the provision of FAR 52-228-15 [the FAR provision that *was* incorporated into the contract] that the bonds be issued by a Treasury Department Circular 570 surety."  *Id*.  For the reasons set forth above, we find that BCI did not waive its right to challenge the liquidated damages rate amount by not raising the issue prior to award of the contract.

B. <u>Reasonableness of Penalty Amount</u>

As noted by this Board in *Metro Machine DBA General Dynamics NASSCO-Norfolk*, ASBCA No. 62221, 22-1 BCA ¶ 38,096 at 185,014, "liquidated damages clauses are perfectly allowable so long as they do not appear to have been designed as a punishment for late performance but, instead, reflect an attempt to place a value on late performance in circumstances where ascertaining that value would be otherwise difficult, if not impossible." In signing the contract here, BCI agreed to the liquidated damages clause set forth in the contract, and as the party challenging the government's assessment liquidated damages, BCI has the burden of proving the clause is unenforceable. BCI's "burden is an exacting one, because when damages are uncertain or hard to measure, it naturally follows that it is difficult to conclude that a particular liquidated damages amount or rate is an unreasonable projection of what those damages might be." *DJ Mfg. Corp.*, 86 F.3d at 1134 (citations omitted).

BCI argues that the liquidated damages rate was not reasonably related to the government's anticipated damages for late completion of the project (app. mot. at 8). According to BCI, the "rate was improperly calculated, which resulted in an inflated liquidated damages rate" (app. mot. at 8). As support, BCI relies upon deposition testimony of Mr. McCarn, the USACE quality assurance representative, to the effect that the government should have assumed, for the positions of "construction representative and the officer engineer," that there would be three or four ongoing, concurrent projects, yet the government calculated the liquidated damages rate assuming only two active jobs, thus inflating rates of those individuals (*id.*). BCI states:

> Because overhead and other costs in the calculation of the rate are dependent on the costs of the construction representative and the officer engineer, the inflated rates for those two positions results in an inflated per day rate of at least $176 per day ($860 per day based on two concurrent jobs versus $684 per day based on three ongoing jobs.) and as high as $ $263.68 per day ($860 per day based on two jobs vs. $596 per day based on four ongoing jobs. (SMF, ¶ 50-54.) Since Nathan McCarn was to assume 3 to 4 concurrent active jobs, the liquidated damages rate in the Contract was 26% greater than what it would have been if he had used three ongoing jobs and 44% greater than what it would have been had he used four ongoing jobs. (SMF, ¶ 52, 54.)

(App. mot. at 8-9)

30

As noted above, the total contract price was $8,261,206, and the liquidated damages rate of was $860 per day, which equates to 0.01 percent (1/100 of one percent) of the contract price (SOF ¶ 95). In *Kato Corp.*, ASBCA No. 51462, 06-1 BCA ¶ 33,293 at 165,091, we observed that "[t]here is nothing inherently unreasonable about a per day reduction of about 2/100 of one percent of the contract price ($9,103,501.00), i.e., a daily liquidated damages rate of $2,150.00" (citing, *D.J. Mfg. Corp.*, 86 F.3d at 1138 (reduction of 1/15 of one percent of contract price for military supply contract not unreasonable); *Gassman Corp.*, ASBCA Nos. 44975, 44976, 00-1 BCA ¶ 30,720 at 151,743-44 (reduction of about 1/5 of one percent of contract price not inherently unreasonable)). The same logic applies here. There is nothing inherently unreasonable about a per day reduction that equates to 1/100 of one percent of the contract price.

Moreover, even assuming the accuracy of BCI's re-computation of the rate, appellant is not entitled to summary judgment on this issue as "the method used to arrive at the liquidated damages figure is not determinative." *Weis Builders, Inc.*, ASBCA No. 56306, 10-1 BCA ¶ 34,369 at 169,721-722 (citing *DJ Mfg. Corp.*, 86 F.3d at 1137 (trial court correctly held it was unnecessary to inquire into how the liquidated damages figure was derived). Indeed, regardless of how the liquidated damages figure is derived, the clause will be enforced if the amount is reasonable for the particular agreement at the time it was made. *Young Assoc., Inc. v. United States*, 200 Ct. Cl. 438, 445, 471 F.2d 618, 622 (1973). This especially is true because, as noted by the Court of Claims, "[t]he Government's damages stemming from delayed receipt of the supplies or construction it ordered are normally hard to measure." *Young Associates, Inc. v. United States*, 200 Ct. Cl. 438, 444, 471 F.2d 618, 621 (1973). BCI has failed to present sufficient evidence upon which a reasonable factfinder could find that the liquidated damages rate set forth in the contract, as agreed to by the parties, was an unreasonable projection of what damages for late completion of the project might be or was inherently unreasonable. The government is entitled to summary judgment on this issue.

C. Partial/Substantial Completion

It is well established that "after the date of substantial completion or performance, it is improper to assess liquidated damages." *Gassman Corp.*, ASBCA Nos. 44975, 44976, 00-1 BCA ¶ 30,720 at 151,742 (citations omitted). BCI argues that it is entitled to remittance of liquidated damages that were assessed from April 23, 2021, the date that BCI alleges the project was substantially complete, until July 15, 2021, when the government accepted the project (app. mot. at 2). The government argues that disputed material facts prelude entry of summary judgment on the issue of substantial completion (gov't opp'n at 38).

BCI argues that the project was substantially complete as of April 23, 2021, because, at that time, the facility was capable of adequately serving its intended purpose (app. mot. at 4). It is undisputed that, as of April 24, 2021, the project was 95.3 percent complete (SOF ¶ 88). The government argues, however, that, as set forth in its June 16, 2021, letter, 104 items had yet to be completed on the project including "completing repairs on the top of the stilling basin's walls, electric work, and reinstallation of the grouted riprap along the riverbanks" (SOF ¶ 89). According to the government, "[o]n this Project there were items to be completed at the stilling basin as of 23 April 2021, and even as late as USACE's acceptance of the work on 15 July 2021, that were not mere 'punch list' type items" (gov't opp'n at 39). BCI responds that, as to those 104 items, the government's June 16, 2021, letter does not specify how much work regarding each item had yet to be completed (app. reply at 20). Ultimately, by letter dated July 19, 2021, the government confirmed that the contracting officer accepted the project as of July 15, 2021, with additional work identified by the government that remained to be completed including grouted riprap and conduit support for PVC conduit used in connection with a manometer well (SOF ¶¶ 90-91).

BCI also challenges the government's suggestion that the "function of the Stilling Basin was for public recreation and access to the rest of the park and that, as of April 23, 2021, there were several incomplete activities that did not allow for public access to the space" (app. mot. at 6). According to BCI, the project description set forth in the IFB contains no "language that the work was for public recreation or access to the park" (*id.*). BCI relies upon the government's Design Documentation Report as support for its argument that by April 24, 2021, the project was capable of adequately serving its intended purpose (SOF ¶ 4; app. mot. at 5). The Design Documentation Report identified and addressed two issues regarding the project, "(1) repair of the stilling basin wall drain system and (2) retrofitting the stilling basin walls due to overturning stability concerns" (*id.*). According to appellant, work regarding both these issues was completed as of April 23, 2021 (app. mot. at 5).

"Whether a contract has been substantially completed is a question of fact and a project is considered substantially completed when it is capable of being used for its intended purpose." *Maruf Sharif Constr. Co.*, ASBCA No. 61802, 19-1 BCA ¶ 37,239 at 181,276. The parties' respective arguments regarding work that remained to be completed after April 24, 2021, up through July 15, 2021, including the project work listed in the government's June 16, 2021, letter, and whether the project was available for safe use by the public, suggest the existence of material issues of fact regarding whether the project was substantially complete. Summary judgment is appropriate when there is no genuine dispute as to any material fact. FED. R. CIV. P. 56(a). Accordingly, appellant's motion for partial summary judgment on this issue is denied.

IV. <u>The Government's Motion for Partial Summary Judgment</u>

A. <u>BCI's Ready-mix Concrete Claim</u>

The government requests summary judgment on BCI's claim that the Ready-mix contract specifications were defective. The government argues that BCI cannot recover under the Changes clause because the contract requirements never changed (gov't mot. at 15). The government also argues that BCI failed to provide the requisite notice (*id.*).

"To establish that the government-provided specifications are defective, a contactor must prove that it "substantially complied with the government's plans and specifications, and reached an unsatisfactory result." *Pyrotechnic Specialties, Inc.*, ASBCA No. 57890, 17-1 BCA ¶ 36,696 at 178,694 (quoting *Hanley Industries, Inc.*, ASBCA Nos. 54315, 56383, 08-2 BCA ¶ 33,932 at 167,917 (additional citations omitted). BCI has not demonstrated that the concrete specification was defective. Instead, BCI has demonstrated only that its supplier did not manufacture the type of concrete specified, was unwilling to make changes to its batch plant to provide the concrete required by the contract, and ultimately was unwilling to provide the type of concrete required by the contract specifications (SOF ¶¶ 28-31).

The record establishes that (1) BCI's concrete supplier did not utilize or supply the type of concrete called for in the contract and, instead, utilized a different type of concrete which BCI requested be accepted instead of the concrete required by the contract (SOF ¶ 28-30), (2) the government initially denied BCI's request to utilize a different type of concrete (SOF ¶ 31), (3) BCI submitted a variance request (SOF ¶ 32), and (4) the government ultimately agreed to the variance (SOF ¶ 33). As noted by the government, the variance request did "not indicate a cost or time impact" (gov't mot. at 17).

Although appellant cites as support Mr. Eichman's affidavit for the proposition that he searched unsuccessfully for other available fly ash (app. additional material facts dated Feb. 24, 2023, at 7 (¶ 30), citing (Feb. 14, 2023, aff. of Mr. Eichman ¶ 5)), as noted by the government, Mr. Eichman does not state that MCM searched for, but was unable to find, any other GGBF slag or natural pozzolan that met contract requirements (gov't reply at 65; *see also* SOF ¶ 31). Rather, the record establishes that, although the government's May 9, 2018, response to RFI-0021 noted that the contract allowed for use of GGBF slag instead of Fly Ash (SOF ¶ 30), BCI's supplier was unwilling to provide BCI with GGBF slag, "or any other slag" because of storage and production limitations at MCM's plant (SOF ¶ 30). Simply put, BCI and its supplier simply refused to consider an alternative concrete mix provided for in the contract. Regarding the alleged 21 days of delays encountered by BCI while the concrete mix design was being approved, the record establishes that BCI waited seven

33

months after issuance of the Notice to Proceed to submit its concrete mix design (SOF ¶ 35).

Appellant argues that, upon approving the variance request, the contracting officer was obligated pursuant to FAR 52.236-21 (discussing specifications and drawings for construction) to issue a modification to the contract (app. opp'n at 7). The government disagrees, stating that FAR 52.236-21 applies to submission of shop drawings and that the variance request submitted by appellant was classified by appellant as SD-03, Product Data, not SD-02, Shop Drawing (gov't reply at 70). The government is correct (*see* SOF ¶¶ 21-22). FAR 52.236-21 concerns submission of shop drawings, not product data. FAR 52.236-21(f). Moreover, the IFB specifically requires the contractor to submit concrete mix designs as SD-03, Product Data (SOF ¶ 22).

BCI has failed to present sufficient evidence upon which a reasonable factfinder could find that there are material facts in dispute as to whether the Ready-mix concrete specification was defective. The government is entitled to summary judgment on this issue.

### B. BCI's Excessive Seepage Claim

The government requests summary judgment on BCI's differing site condition claim for additional costs based upon excessive water seepage at the project site (gov't mot. at 20). BCI seeks entitlement based upon both a Type I and Type II differing site condition (app. opp'n at 22-28, 33), as well as the doctrine of superior knowledge (*id.* at 34-37). According to BCI, a large volume of water on the northwest side of the stilling basin entered the excavation area through a seep in the earthen dam outside the construction site (*id.* at 22). The parties agree that the seepage was caused by a buried electric line installed by another contractor in 2016 for the electric utility company that owns the line (SOF ¶ 48). The parties also agree that there was some amount of seepage at the time of the pre-bid site visit, in that the ground at that location was moist (SOF ¶ 49).

### Type I Differing Site Condition

"A Type I condition consists of 'subsurface or latent physical conditions at the site which differ materially from those indicated in [the] contract.'" *Tidewater, Inc.*, ASBCA No. 61076, 18-1 BCA ¶ 37,195 at 181,076 (citing FAR 52.236-2(a)(1)). To establish a Type I condition, BCI must demonstrate the following:

> (1) the contract documents positively indicated the site conditions that form the basis of the claim; (2) the contractor reasonably relied upon its interpretation of the

34

contract documents; (3) the conditions actually encountered differed materially from those indicated in the contract; (4) the conditions encountered were unforeseeable based on all the information available at the time of bidding; and (5) the contractor was damaged as a result of the material variation between the expected and the encountered conditions.

*Sherman R. Smoot Corp.*, ASBCA Nos. 52173, 53049, 01-1 BCA ¶ 31,252 at 154,344 (citing *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1581 (Fed. Cir. 1987)).

To be eligible for an equitable adjustment for a Type I differing site condition, factors (1) and (3) above require that the contract actually indicate what the conditions encountered would be. *See Comtrol, Inc. v. United States*, 294 F.3d 1357, 1363 (Fed. Cir. 2002) (citing *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984)); *see also United Contractors v. United States*, 177 Ct. Cl. 151, 161-62, 368 F.2d 585, 595 (1966) (interpreting the Changed Condition clause)[6] and stating that where a contract is silent about an alleged unforeseen conditions there "can be nothing 'shown on the drawings or indicated in the specifications' from which the actual ... conditions can 'materially' differ") (quoting *Ragonese v. United States*, 128 Ct. Cl. 156, 159, 120 F. Supp. 768, 769 (1954)). Here, BCI does not identify any contractual language indicating what the conditions would be at the location of the "electrical seep," let alone any misleading information pertaining to the electrical seep. Rather BCI admits that the solicitation set forth no information about conditions in the area of the electrical seep (app. opp'n at 25-26) (noting the government's "lack of disclosure of the electrical seep in the Solicitation" and that the government "did not show the electrical seep on the Drawings"). Indeed, BCI notes that the area of the electrical seep sat outside the project's construction site (app. opp'n at 28) (stating "electrical seep on the earthen dam [was] outside of the construction limits"). BCI has failed to present sufficient evidence upon which a reasonable factfinder could find that the contract indicated what conditions would be at the site of the electrical seep would be or the existence of a Type I differing site condition. The government is entitled to summary judgment on this issue.

Type II Differing Site Condition

A Type II condition involves "unknown conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered." FAR 52.236-2(a).

---

[6] The Changed Condition clause was a predecessor to the Differing Site Condition clause. *Olympus*, 98 F.3d at 1316.

35

To be eligible for an equitable adjustment for a Type II differing site condition, the contractor must establish "the recognized and usual conditions at the site, the actual physical conditions encountered and that they differed from the known and usual, and that the different conditions caused an increase in the cost of contract performance." *Nova Grp., Inc.*, ASBCA No. 55408, 10-2 BCA ¶ 34,533 at 170,329. As recognized by the Board, this "is a 'relatively heavy burden of proof.'" *Zafer Constr. Co.*, ASBCA No. 56769, 17-1 BCA ¶ 36,776 at 179,235 (quoting *Charles T. Parker Constr. Co. v. United States*, 193 Ct. Cl. 320, 333, 433 F.2d 771, 778 (1970)).

Although the parties agree that ground at the site of electrical seep was moist at the time of the pre-bid site visit (SOF ¶ 49), the record establishes that BCI first experienced problems caused by the electrical seep *over a year* after commencement of the project work and approximately 21 months after contract award (SOF ¶ 52). According to the government water from the electrical seep "began during a time of unprecedented heavy rain and flooding in the Spring 2019" (gov't mot. at 22).

The question presented here is whether the electrical seep can be considered a Type II differing site condition where the condition complained about by BCI (water entering the work site) was not the condition as it existed at the time of contract award. The government cites *Olympus v. United States*, 98 F.3d 1314, 1316-1318 (Fed. Cir. 1996), for the proposition that the differing site condition clause "applies only to conditions that exist when a contract is executed and is inapplicable when the condition the contractor complains of arose after the contract is executed" (gov't reply at 76).

As noted above, summary judgment is appropriate if the movant demonstrates there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Regarding appellant's excessive seepage claim, and the government's motion for partial summary judgment, our review identifies at least one disputed issue for trial: whether the water that was present at the site of the electrical seep was the same condition at the time of contract award that ultimately caused additional water to enter the jobsite some 21 months later (and thereby delay appellant's ability to perform contract work). It is undisputed that water was located at the electrical seep site at time of contract award, and that government was aware of this fact. A factual issue remains regarding what caused the increase in water flow at the site, i.e., whether water at the site of the electrical seep at the time of contract award is the same condition that ultimately caused water to enter the jobsite some 21 months later. Whether conditions at the site of the electrical seep were simply made worse by heavy rains likewise presents a material issue of fact. The government argues that BCI cannot recover for a differing site condition if the cause of the increased seepage was an unusually heavy amount of precipitation because unusually adverse weather is not proper basis for such a recovery (gov't mot. at 23).

36

We note that neither party addresses whether the seepage encountered at the site "differed from the known and usual" conditions to be expected at a site such as this. Although the solicitation did not mention the existence of the "electrical seep," the specification included notice about the existence of groundwater sources that included "but are not limited to dam foundation underseepage, seepage through the abutments, tail water in the stilling basin, and precipitation infiltration" (SOF ¶ 45). We do not decide here whether the seepage BCI encountered at the project site differs from known and usual conditions at a dam site such as this; however, as noted above, BCI has a relatively heavy burden of establishing entitlement pursuant to a Type II differing site condition.

BCI suggests also that the government intentionally placed rocks at the site of the electrical seep "to cover up the seep with a rock during the pre-bid site visit" (app. opp'n at 36). According to BCI, Mr. McCarn stated in his deposition that "a pile of rocks had been piled there to 'cover up' the saturated rock on the shoulder" (*id.* at 25). BCI then concludes that it could not know of the existence of the pooled water pre-award, thereby excusing having not noticed the condition during the pre-bid site visit. Regarding the existence of rocks placed at the site of the electrical seep, Mr. McCarn stated in his deposition that the "area was moist on the ground. There was a pile of rock there to try and help to spread out for the area that kept getting saturated" (SOF ¶ 50). In response to a question by appellant's counsel regarding why a rock was placed at that location "if all the water was going underground," Mr. McCarn replied "[y]ou'll have to ask the operations manager. They are in charge of maintenance." (R4, tab 1035; app. opp'n ex. (dep. of Nathan L. McCarn at 110) When asked to speculate, Mr. McCarn replied "[t]hat it's there to cover up the saturated rock on the shoulder" (*id.*). To the extent BCI suggests that Mr. McCarn's testimony establishes a deliberate attempt by the government to cover up or hide the existence of moisture at the site of the electrical seep during the pre-award site inspection, we feel constrained to note that a reasonable fact-finder could not make a determination - based upon Mr. McCarn's testimony proffered by BCI - that the government's actions reflect an intention to hide or conceal water pooling at the location of the electrical seep in an area outside of the construction project site. Whether BCI should have noticed the seepage during the site visit is a question of fact that also cannot be decided on motion for summary judgment.

Notification of Differing Site Condition

The government argues that BCI failed to comply FAR 52.236-2, which requires the contractor to promptly give written notice to the contracting officer "before the conditions are disturbed," and cautions that "[n]o request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required." FAR 52.236-2(a), (c) (*See also* gov't mot. at 20). As this Board noted in *Goodloe Marine, Inc.*, ASBCA No. 61960,

37

23-1 BCA ¶ 38,387 at 186,521, "it has long been held that [the differing site condition clause] does not preclude contractor claims advanced without the required notice so long as the government was not prejudiced by the lack of such notice."

On the issue of whether BCI provided the requisite notice, BCI alleges that, as reflected in Mr. McCarn's QAR, it informed Mr. McCarn about water seeping into the construction site (SOF ¶ 54). However, Mr. McCarn was not the contracting officer. On the issue of prejudice, the government notes that the contracting officer in the final decision set forth "a timeline of events related to excessive seepage," including when appellant first noticed water at the site, when it began excavation, and when it cut a four inch drain pipe, all prior to when BCI notified the contracting officer of the differing site condition (gov't reply at 77-78; *see* SOF ¶¶ 52-53). The government states that BCI's "actions in venturing outside the worksite boundaries and digging, instead of stopping work and notifying the Contracting Officer of what was occurring, prevented the parties' ability to investigate potential solutions. As said by the Contracting Officer, Appellant instead made the situation worse." (Gov't reply at 78)

Whether BCI provided notice to the contracting officer, either constructive or actual, and whether the government was prejudiced by BCI's actions, presents issues of material fact. Accordingly, we are unable to decide these issues on the government's motion for partial summary judgment.

BCI argues that (1) the contracting officer failed to raise in the final decision lack of notice or untimely notice to appellant's differing site condition claim, (2) the government failed to plead lack of notice as an affirmative defense, and (3) the government had actual or constructive notice of the differing site condition (app. opp'n at 28-32). In support of its first argument - that the government is deemed to have waived the notice requirement where the contracting officer fails to address the differing site condition claim in the final decision - BCI cites citing, *Precision Standard, Inc.*, ASBCA No. 54027, 03-2 BCA ¶ 32,265 at 159,600 (see app. opp'n at 7). However, *Precision Standard* concerned the Changes clause, not the Differing Site Condition clause, and, as such, has no application here. *Id.*

Regarding appellant's allegation that the government failed to assert waiver as an affirmative defense, the government admits as much and, instead, moves to amend its answer to include the affirmative defense of lack of notice regarding appellant's differing site condition claim (gov't reply at 80). "As an initial point, we do not consider arguments raised for the first time in a reply brief." *Chugach Federal Solutions, Inc.*, ASBCA No. 61320, 19-1 BCA ¶ 37,314 at 181,494 (citing *Raytheon Co., Space & Airborne Sys.*, ASBCA No. 57801 *et al.*, 15-1 BCA ¶ 36,024 at 175,960 n.3). Accordingly, if the government seeks leave to amend its answer, it should do so in a separate motion, thus allowing BCI the opportunity to respond to the government's request. As of the filing of the parties' motions for summary judgment,

BCI certainly is now on notice of the government's arguments that would make up its affirmative defense, and this mitigates against not allowing the defense to proceed here. However, discovery is now closed. One issue the parties should consider – to the extent the government decides to file a motion to amend its answer – is whether BCI requires additional discovery regarding the government's waiver argument.

Superior Knowledge

The government argues that BCI is not entitled to recover under the doctrine of superior knowledge because appellant has proffered no evidence that the government was aware of water runoff from the site of the electrical seep into the project area at the time of contract award because that condition did not exist until well into contract performance (gov't mot. at 24-26). To recover for undisclosed superior knowledge, appellant must establish the following:

> (1) it undertook to perform without vital knowledge of a fact which affected performance costs or duration, (2) the government was aware that the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied by the government misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*Steelhead Constructors, Inc.*, ASBCA No. 55283, 06-2 BCA ¶ 33,388 at 165,530 (citing *Hercules, Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir.1994), *aff'd on other grounds*, 516 U.S. 417 (1996)).

As noted above, if calculated from the date of contract mobilization, over 13 months passed before BCI began experiencing problems caused by the electrical seep, and if calculated from the date of contract award approximately 21 months passed before problems regarding seepage arose (SOF ¶ 52). Whether the government's knowledge of the wet conditions at the time of contract award constitute superior knowledge depends upon whether the wet conditions (which admittedly worsened during contract performance) constitutes vital knowledge of a fact which affected performance costs or duration. As with the issue of a Type II differing site condition, although the parties agree that the seepage was caused by the electrical line (SOF ¶ 48), we must determine factually whether water at the site of the electrical seep at the time of contract award is the same condition that ultimately caused water to enter the jobsite some 21 months later.

Moreover, the fact that the parties agree the ground at the site of electrical seep was moist at the time of the pre-bid site visit (SOF ¶ 49), is not a proper basis upon

39

which to find that the government knew that water from that area eventually would enter the project site at some point after contract award. Assuming for the sake of argument the Board ultimately determines that electrical seep was a Type II differing site condition, this finding could be of import to the issue of superior knowledge. Because this presents an issue of material fact, we are unable to resolve on the government's motion for partial summary judgment application of the superior knowledge doctrine to this appeal.

### C. BCI's COVID-19 Delay Claim

BCI seeks $154,538.84, and an 89-day time extension, based upon alleged delay caused by the COVID-19 pandemic (SOF ¶ 55). Specifically, BCI seeks "additional compensation because of previous actions of the Government in its contractual capacity that pushed the schedule for the work into the period of the impact of COVID-19, which impact began in March 2020," including a "Stop Work Order and the extensions thereto that were issued by the Contracting Officer, which the Government has acknowledged were changes to the Contract" (app. opp'n at 56). Of the 89 days of alleged delay for COVID-19, BCI alleges 59 days of delay for late delivery of materials from Oldcastle Infrastructure due to COVID-19, which thereby impacted critical path activities (app. opp'n at 67). BCI also alleges 30 days of delay and seeks $97,008.81 for increased labor and material costs on behalf of Nicholson as a pass through claim (SOF ¶ 69).

The government requests summary judgment on BCI's COVID-19 claim on the basis that BCI cannot establish any excusable delay that was beyond its control or that of its subcontractor, and that BCI cannot demonstrate that COVID-19 impacted the contract work (gov't mot. at 26). The government also challenges BCI's assertion of entitlement based upon the contract's default clause (*id.* at 27) (citing FAR 52.249-10); (*see also* SOF ¶ 6), and the Changes clause (gov't mot. at 31); (SOF ¶ 6); *see also* FAR 52.243-4. Regarding the default clause, the government argues that BCI is entitled to no monetary relief because the default clause limits a contractor to recovery of additional time for excusable delay (gov't mot. at 27).[7] The government argues that BCI cannot recover under the Changes clause because the contract requirements never changed and BCI failed to provide the requisite notice (*id.* at 31).

"A contractor is entitled to an equitable adjustment under the Changes clause for disruption to its sequence of work caused by an unforeseeable occurrence for which the Government is responsible." *Commercial Contractors Equipment, Inc.*, ASBCA No. 52930 *et al.*, 03-2 BCA ¶ 32,381 at 160,258 (citing *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1348-49 (Fed. Cir. 2000)); *see also Lea County Constr. Co.*, ASBCA

---

[7] We note that BCI likewise agrees that the default clause limits a contractor to time extensions only and does not provide for monetary recovery (app. opp'n at 48).

No. 10093, 67-1 BCA ¶ 6,243 at 28,929 (additional costs encountered by contractor held allowable where "they are a direct and foreseeable result of the pre-existing Government delays which forced this work into the wintry weather"). This appeal, however, presents the issue of whether the government is responsible for unforeseeable delays that occurred after a government-caused delay. BCI alleges that the government should be held responsible for its alleged increased costs (related to COVID-19) incurred subsequent to the Stop Work Order, while the government maintains that it is not liable for these increased costs because the COVID-19 pandemic was not a foreseeable event at the time the government issued the Stop Work Order (gov't mot. at 30-31; app. opp'n at 59). According to BCI, the government "has not cited a single case where impact costs were disallowed from a change to the contract or from a differing site condition because the Government did not cause the underlying reason why the change was issued," and that the government "has not cited a single case where the only impact costs allowed are those that are foreseeable at the time a change order is issued are allowed" (app. opp'n at 59-60).

In *Nassar Grp. Int'l*, we held that:

> [a] contractor is entitled to an additional equitable adjustment when a government delay pushes a contractor's performance into a period of seasonal adverse weather - such as a rainy season - but a contractor is not entitled to such an adjustment when the government's delay pushes the contractor's performance into a period of unusual adverse weather because the additional weather delay is not reasonably foreseeable in that case.

*Nassar Grp. Int'l*, ASBCA No. 58451 *et al.*, 19-1 BCA ¶ 37,405 at 181,833-34.

The same principle applies to these appeals. Even assuming for the sake of argument that the government was at fault for the conditions that led to issuance of the Stop Work Order, the government would not be liable for additional costs experienced by BCI based upon the COVID-19 pandemic, as COVID-19 was not a reasonably foreseeable event at the time the government issued the Stop Work Order. Indeed, such a finding is in conformance with the contract's Default clause whereby BCI may be entitled to additional days to perform the contract based upon unforeseeable occurrences such as epidemics or quarantine restrictions; BCI would not be entitled, however, to additional compensation. FAR 52.249-10(b)(1)(vi)-(vii). This is especially true where the contract here was a fixed-price contract (SOF ¶ 7), under which the contractor bears the risk of increased costs. *JE Sinn Consulting, LLC*, ASBCA Nos. 63553, 63383, 23-1 BCA ¶ 38,348 at 186,220 (rejecting contractor's request for equitable adjustment for increased steel costs due to the pandemic because

41

a "firm fixed-price contract is not subject to any adjustment based [on] the contractor's cost experience in performing the contract") (citing FAR 16.202-1).

BCI cites *George Sollitt Const. Co. v. United States*, 64 Fed. Cl. 229, 239-40 (2005) and *E. Coast Repair & Fabrication, LLC v. United States*, 199 F. Supp. 3d 1006, 1089 (E.D. Va. 2016), as support for its proposition that the government must reimburse BCI for "impact costs" incurred because government-caused delays "push[ed] work into a later point in time" (app. opp'n at 58). BCI's reliance upon these decisions is misplaced. As noted by the government, both *Sollitt* and *E. Coast Repair* concerned weather related delay and impacts experienced by the contractor, and, as such were not delays caused by the government (gov't mot. at 30; gov't reply at 87). Moreover, in neither case did the court award the type of relief BCI requests here. *Sollitt*, 64 Fed. Cl. at 239 (stating in dicta that increased costs of winter construction *may* be compensable); *E. Coast Repair*, 199 F. Supp. 3d at 1089 (stating in dicta that weather related expenses *may* be recoverable but that the contractor had failed to meet its burden of proof regarding delay damages).[8]

We note also that, even if somehow on point, neither of these cases are binding precedent for this Board, as decisions of the Court of Federal Claims, are not "binding upon this tribunal, nor are they even binding in other matters pending before the Court of Federal Claims." *Northrop Grumman Corp.*, ASBCA No. 62165, 21-1 BCA ¶ 37,922 at 184,180 n.8 (citing *C.R. Pittman Constr. Co., Inc.*, ASBCA No. 57387 *et al.*, 15-1 BCA ¶ 35,881 at 175,427 n.6 (Court of Federal Claims decisions are not binding precedent for the ASBCA); *Zaccari v. United States*, 142 Fed. Cl. 456, 462 n.6 (2019) ("Decisions of the United States Court of Federal Claims do not bind the court in this matter but may provide persuasive authority"). The same is true regarding decisions of United States district courts. *Swr, Inc.*, ASBCA No. 56708, 15-1 BCA ¶ 35,832 at 175,221 ("this Board does not consider a district court decision to be precedent 'binding' on it if the decision was issued in an appeal other than the one currently before the Board").

BCI cites our decision in *Emerald Maint., Inc.*, ASBCA No. 43929, 98-2 BCA ¶ 29,903 at 148,054, for the proposition that a contractor may recover impact costs for extended job performance and increased periods of contract performance resulting from multiple government-caused changes and delays such as differing site conditions and design defects (app. opp'n at 51). In *Emerald*, the government admittedly caused

---

[8] BCI cites two additional decisions of the Court of Federal Claims decisions for the unremarkable proposition that a contractor may recover additional costs for government-caused delays (app. opp. 50-51) (citing *Doninger Metal Prod., Corp. v. United States*, 50 Fed. Cl. 110, 125 (2001); *G.M. Shupe, Inc. v. United States*, 5 Cl. Ct. 662, 699 (1984); *Meridian Eng'g Co. v. United States*, 144 Fed. Cl. 667, 674 (2019)).

some of the problems which delayed contract performance and thereby pushed contract work into monsoon season, for which the Board awarded certain delay costs. *Emerald Maint.*, 98-2 BCA ¶ 29,903 at 148,054. Although the Board, in dicta, suggested that the contractor could "recover some 'impact' costs," the Board did not award such costs as the contractor failed to substantiate its "resultant injury by direct and specific proof." (*Id.*) (internal citations omitted). Here, however, BCI would not be entitled to such impact costs because the monsoon season of which the contractor complained, was a foreseeable event, unlike the COVID-19 pandemic, upon which BCI's claim here is based. As noted by the government, unlike the facts in *Emerald*, the government here "did not cause problems extending the time for performing the contract work into 2020 and beyond," and issued modifications adding time to the contract completion date and paying BCI "for its standby costs due to the suspension of work caused by weather-necessitated water releases" (gov't reply at 89).

BCI's COVID-19 claim does not specify any additional material costs allegedly incurred because of COVID-19. Rather, BCI seeks what it terms "BCI Onsite Rentals Per Day Rate" and "BCI Operated equipment," as set forth in BCI's December 12, 2021, certified claim (SOF ¶ 68).[9] BCI also asserts increased labor costs of its subcontractor (SOF ¶ 69). In *Heart & Core LLC*, ASBCA No. 63403, 23-1 BCA ¶ 38,265 at 185,803, we held that a contractor under firm-fixed price contract is not entitled to reimbursement for increased labor costs allegedly caused by the COVID-19 pandemic because the contractor "bore the risk of cost increases and the government is not obligated to adjust the prices to account for them." Likewise, we hold that, even assuming BCI or Nicholson was delayed by COVID-19, BCI and Nicholson are not entitled to additional labor or material costs allegedly caused by the pandemic. This includes the $97,008.81 for increased labor and material costs sought on behalf of Nicholson.

Regarding BCI's request for additional days to complete the contract, of the 89 days of alleged delay for COVID-19, BCI alleges 59 days of delay caused by late delivery of materials from Oldcastle Infrastructure which impacted critical path activities (app. opp'n at 67). The additional 30 days of alleged delay sought by BCI is brought on behalf of Nicholson (SOF ¶ 69). Regarding delivery issues involving Oldcastle Infrastructure, the parties offer divergent interpretations of deposition testimony of BCI employee Brian Butler regarding supply issues BCI experienced regarding manhole covers supplied by Oldcastle Infrastructure and their alleged impact upon the project (SOF ¶ 67). Regarding Nicholson's 30 days of alleged delay, the government responds that Nicholson's own documentation and the testimony of

---

[9] In their respective briefs, neither party addresses in any meaningful way BCI's alleged additional costs set forth in its COVID-19 claim, or what type of costs are covered by "BCI Onsite Rentals Per Day Rate" and "BCI Operated equipment" (SOF ¶ 68).

43

Nicholson's employees establishes that Nicholson sought only a 14-day time extension related to COVID-19 as opposed to 30 days (SOF ¶ 69). Indeed, undisputed facts establish that Nicholson planned to remobilize beginning March 30, 2020, with setup and work resuming on April 1, 2020 (SOF ¶ 59), that Nicholson was back onsite and performing work as of April 1, 2020 (SOF ¶ 63), and that the government did not direct Nicholson to draft or develop the "travel options" the company issued to its employees (SOF ¶ 65).

At bottom, the government's motion for partial summary judgment, appellant's opposition in response, and the government's reply brief all set forth factual disagreements regarding alleged time delays experienced by BCI and Nicholson because of COVID-19 (SOF ¶¶ 67-69), including the alleged impact of those time delays on the critical path (SOF ¶ 67). We note it is undisputed that (1) COVID-19 did not impact the actual jobsite in that the government issued no directives on this project in response to the COVID-19 pandemic about methods of travel (SOF ¶ 64), (2) BCI continued to work on the project after issuance of the President's March 13, 2020, Proclamation concerning the COVID-19 outbreak and national emergency (SOF ¶¶ 58-59, 63), and (3) the project did not experience an outbreak of COVID-19 during contract performance (SOF ¶ 66).

The government's motion for summary judgment challenging BCI's claim for alleged additional costs incurred because of COVID-19 is granted. Whether BCI is entitled to additional time because of alleged delays encountered because of COVID-19 presents material issues of fact that we are unable to resolve on motion for partial summary judgment.

Sovereign Acts Defense

The government's motion for partial summary judgment asserts that BCI's COVID-19 claim is barred by the sovereign acts defense (gov't mot. at 29-30). Specifically, the government argues "that the federal government, when acting as a contracting party, cannot be held liable for an obstruction to the performance of a contract resulting from its public and general acts as a sovereign," and that "[i]n its capacity as the sovereign, the government can impact a contractor's performance of a contract, and, in such instances, the government is released from liability for damages resulting from its sovereign acts, so long as those acts are 'public and general' and not directed at a particular contract" (*id.* at 29). The government cites two ASBCA decisions in which we found that actions taken by the government to address the COVID-19 pandemic – *JE Dunn Constr. Co.*, ASBCA No. 62936, 22-1 BCA ¶ 38,123 at 185,192 (instituting a quarantine of 14 days upon arrival to the project site), and *APTIM Federal Services, LLC*, ASBCA No. 62982, 22-1 BCA ¶ 38,127 at 185,219 (closing of an Air Force base to all non-operationally urgent personnel) – constituted

sovereign acts for which the government cannot be held liable (gov't mot. at 29). Neither decision is controlling here.

In a recent decision, *StructSure Projects, Inc.*, ASBCA No. 62927, 23-1 BCA ¶ 38,416 at 186,680, this Board held that application of the sovereign acts defense requires that "the government acting as a contractor must have breached the contract." The government points to no such breach of contract here and, indeed, asserts that it did nothing to obstruct performance of the contract based upon the COVID-19 pandemic (gov't mot. at 10, ¶¶ 54-55) ("USACE did not issue directives about methods of travel (airplanes vs. driving) or rotating crews in response to COVID" and "USACE did not direct Nicholson to put together or develop the 'travel options' that were issued by Nicholson to its employees). BCI correctly notes that the government "does not mention any act of the Government on which it relies for the Sovereign Acts Defense," and that the government "defeats its own affirmative defense by stating in its Brief that: 'As explained above, it is undisputed that USACE did not issue COVID-related directives or orders to Appellant or any of its subcontractors'" (app. opp'n at 54 (quoting gov't mot. at 29-30)). In its reply brief, the government fails to respond to BCI's arguments regarding the inapplicability of the sovereign acts defense in these consolidated appeals. We hold that the government cannot rely upon the sovereign act defense as a basis to deny BCI's COVID-19 claim. Its request for summary judgment on this issue is denied.

D. BCI's Riprap Claim

BCI seeks $30,489.49, based upon alleged extra work involving placement of riprap (SOF ¶ 70). The government argues it is entitled to summary judgment on BCI's riprap claim because there was no change to the contract whereby BCI was required to reinstall and regrout riprap because the contract specified that the riprap in question was not to be removed (gov't mot. at 33). The government also argues that BCI failed to provide the requisite notice set forth in the Changes clause, and that this lack of notice prejudiced the government (*id.*). BCI asserts impossibility of performance in support of its riprap claim, suggesting that requirement set forth in IFB Amendment No. P0004, "that the rip rap was not to be removed, create[d] an impossible situation to perform the specified work" (app. opp'n at 42). The government responds, noting that BCI's RFP pertaining to riprap contained no allegation that the "required work was impossible to perform without removing the rip rap" (gov't mot. at 34).

Regarding BCI's claim of impossibility, "the general rule of law is that when a contractor accepts a contract, the contractor is responsible for the means, knowledge, and processes required to perform the contract." *AIW – Alton, Inc.*, ASBCA No. 47917, 95-2 BCA ¶ 27,875 at 139,066 (citing *Lieco, Inc.*, ASBCA No. 11905 *et al.*, 68-2 BCA ¶ 7092 at 32,848). Whether the contractual requirements here were

45

impossible to perform raises a question of fact that cannot be decided on summary judgment. *B.S.A. Painting Co., Inc.*, ASBCA No. 32060, 87-1 BCA ¶ 19,367 at 97,945, *recon. denied*, 87-2 BCA ¶ 19,871. Accordingly, we are unable to resolve this issue as presented by the government. We note, however, that "[h]aving alleged impossibility, if appellant is to prevail it is not sufficient to prove difficulty, it must prove impossibility," *Lieco, Inc.*, 68-2 BCA ¶ 7092 at 32,848 (citing *ITT Kellogg, A Division of IT&T Corp.*, ASBCA No. 9580, 65–2 BCA ¶ 5077), and that "[a] difficult requirement does not render the requirement impossible." *AIW – Alton, Inc.*, 95-2 BCA ¶ 27,875 at 139,066 (citing *Lieco, Inc.*, 68-2 BCA ¶ 7092 at 32,848).

In response to the government's motion BCI also argues, as it did regarding the issue of differing site condition and electrical seep, that (1) the contracting officer's final decision failed to raise lack of notice or untimely notice in response to appellant's changed condition claim, (2) the government failed to plead lack of notice as an affirmative defense, and (3) the government had actual or constructive notice of appellant's riprap claim (app. opp'n at 42-43). Regarding the first two arguments, the government admits that the final decision does not address the issue of notice (app. additional material facts dated Feb. 24, 2023, at 29 (¶ 134); gov't reply at 33 (¶ 134)) and that the government did not assert lack of notice as an affirmative defense (gov't reply at 83). The government again requests leave to amend its answer (*id.*). For the reasons already stated, we deny the government's request submitted for the first time in its reply brief. If the government wishes to seek leave to amend its answer, it should do so in a separate motion, thus allowing BCI the opportunity to respond to the government's request.

Regarding the issues of prejudice and constructive notice, it appears there is an issue of fact regarding when BCI began work removing the riprap at the project site. According to appellant, "[o]n November 12, 2018, before removing the rip rap, BCI sought by RFI-0039 the extent of the amount of the rip rap to be removed" (app. additional material facts dated Feb. 24, 2023, at 27 (¶ 126) (citing "Dep. Exh. 96, p. 4" which we assume is a reference to RFI-0039, and is reproduced at R4, tab 690 at COE000004)). The government, however, suggests it is "undisputed" that BCI "had already removed the riverbank riprap when it asked the ACO to request a proposal from it for doing the work," and that "[t]he request to the ACO was post-hoc, after-the-fact, because the rip rap had already been removed from the riverbank" (gov't reply at 82 (citing R4, tab 691, and stating that BCI already "had 'removed rip rap that was to remain in place'" (gov't reply at 82 n.191))). This dispute likewise suggests the existence of a material issue of fact regarding when BCI commenced removal of the grouted riprap, thus precluding resolution of this issue on the government's motion for partial summary judgment.

46

V. BCI's Motion for Partial Summary Judgment

As noted above, and as discussed further below, the government's response to appellant's motion for partial summary judgment concedes entitlement on some of BCI's claims, as well as on BCI's challenges to certain government affirmative defenses.

A. Sidewalk Placement

Regarding appellant's sidewalk placement claim, the government in its responsive brief "agrees to entitlement as to the sidewalk isolation joints and sealant claim, but quantum (the amount of costs claimed by Appellant) is disputed" (gov't opp'n at 1). The government states also that it "will issue a unilateral modification for the sidewalk isolation joints and sealant claim" (*id.*). As noted above, the government issued unilateral Modification No. R00026, dated March 16, 2023, awarding BCI additional costs of $24,559.11, for the installation of isolation joints and sealing on the sidewalk, and added seven days to the contract completion date based upon the sidewalk placement claim (SOF ¶ 109). To the extent BCI seeks additional compensation for sidewalk placement beyond the amount granted it in Modification No. R00026 (BCI's original claim sought $28,133.54 (SOF ¶ 82)), that issue remains to be resolved by the parties.

B. Winter Drawdown

The parties agree that BCI is entitled to 12 additional days of performance based upon the government's winter drawdown of the lake (SOF ¶ 42). As to the remaining three days of alleged delay (November 7, 2020, and December 11-12, 2020), the parties disagree as to whether the government's authority to initiate a winter drawdown is properly based upon the contract's Default clause, Differing Site Conditions clause, or Changes clause (app. mot. at 12-13; gov't opp'n at 47, 50). The parties also disagree upon a litany of facts surrounding activities at the site during those three days, including the type of work being performed, and whether and how much of the work was attributable to the winter drawdown (app. reply at 40-41; gov't opp'n at 52-53). The parties have presented genuine issues of material issues of fact which preclude us from deciding this issue on motion for summary judgment.

Although we do not decide this issue here, we note that BCI's argument is based, in part, upon the fact that the term "winter drawdown" does not appear in the contract, and that when the government initiated the winter drawdown here "it changed the Contract from no mention of winter drawdown to an actual winter

drawdown" (app. reply at 38).[10]  While BCI is correct as to the absence of the words "winter drawdown" in the contract, the contract clearly put BCI on notice of the government's right to release water from the Tuttle Creek Dam into the Big Blue River.  Specifically, paragraph 1.5.2, Lake Releases During Construction, informed BCI that "[r]eleases through the outlet works are weather and inflow dependent.  Close coordination between the Tuttle Creek Operations Manager, Contracting Officer and the contractor is required" (SOF ¶ 37).

Appellant argues also that "[t]he act of doing the Winter Drawdown was done by the Corps itself," and that "the Winter Drawdown was an act of the USACE because the parties have stipulated that the Corps made the decision on how much water to release and when to release the water for the Winter Drawdown and made the decision on when to do the Winter Drawdown that occurred in November and December 2020" (app. reply at 39).  However, as noted above, the contract specifications inform BCI that such releases are weather-dependent, *i.e.*, the government's decision regarding winter drawdown is dependent upon factors such as weather conditions and water levels in the lake (SOF ¶¶ 37, 107).  Ultimately, whether the government's winter drawdown is properly characterized as a weather event presents a question of fact, one which we are unable to resolve on motion for summary judgment.  Accordingly, BCI's motion for partial summary judgment on this issue is denied.

C. Accord and Satisfaction

Appellant's motion for partial summary judgment challenges the government's affirmative defense of accord and satisfaction on material cost increases (Modification Nos. R00014, R00016, and R00018), sidewalk placement (Modification No. R000020), and winter drawdown (Modification No. R00021) (app. mot. at 20).  The government's brief in response to appellant's motion admits that accord and satisfaction does not bar the 2020 winter drawdown claim, the sidewalk joint installation claim, or the 80-day standby material costs increase claim that began on November 1, 2019 (gov't opp'n at 1, 44-45).  Accordingly, we conclude, regarding Modification Nos. 00014, 00016, and 00018, that appellant's claims for 2020 winter

---

[10] In its motion for partial summary judgment, BCI appears to suggest that the government could have initiated the winter drawdown pursuant to the Changes clause, stating it "would have meant that BCI would be entitled to compensation, not just time extensions" (app. mot. at 14).  In its reply brief, BCI takes the opposite position, stating that it "disagrees that the Winter Drawdown should have been issued pursuant to the changes clause because the ACO's serial letter regarding the 2020 winter drawdown was not a change order nor was it a direction and instruction interpretation or determination that the change [sic] original scope of work" (app. reply at 38).

drawdown claim, the sidewalk joint installation claim, and the 80-day standby material costs increase claim that begins on November 1, 2019, are not barred by accord and satisfaction or release and grant appellant partial summary judgment on this issue.

CONCLUSION

For the reasons set forth above, appellant's motion for partial summary judgment is granted on (1) appellant's entitlement to additional costs incurred for sidewalk placement (with the issue of quantum remaining to be decided) (ASBCA No. 63200), and (2) appellant's challenge to the government's assertion of accord and satisfaction in that the affirmative defense does not bar appellant's sidewalk isolation joints and sealant claim, appellant's 2020 winter drawdown claim, or appellant's material cost increases claim for alleged standby costs that began accruing on November 1, 2019 (ASBCA Nos. 62657, 62975).  The government's motion for partial summary judgment is granted (1) on the issue of defective specification regarding the Ready-mix concrete (ASBCA No. 62975), (2) on appellant's Type I differing site condition electrical seep claim (ASBCA No. 62975), and (3) on BCI's claimed additional COVID-19 costs (ASBCA No. 63200).  The government's motion for partial summary judgment is denied regarding (1) appellant's Type II differing site condition and superior knowledge electrical seep claim (ASBCA No. 62975), (2) appellant's claim of impossibility regarding removal of grouted riprap (ASBCA No. 63200), and (3) appellant's request for additional days based upon COVID-19 delays, as material issues of fact preclude the Board from granting summary judgment on these issues at this juncture in the proceedings (ASBCA No. 63200).  The government's motion for partial summary judgment based upon its assertion of the sovereign act defense is denied (ASBCA No. 63200).

Regarding the parties' motions on the issue of liquidated damages (ASBCA No. 63200), the government's motion on the issue of waiver is denied, as appellant did not waive its right to challenge the liquidated damages daily rate set forth in the contract by not raising the issue pre-award.  The government's motion for partial summary judgment regarding the reasonableness of the actual liquidated damages rate is granted, as BCI has failed to present sufficient evidence upon which a reasonable factfinder could find that the liquidated damages rate set forth in the contract, and agreed to by the parties, was an unreasonable projection of damages.  Material issues of fact preclude the Board from granting the remaining issues raised in the parties' motions regarding the government's assessment of liquidated damages in the amount

49

of $228,760, including appellant's alleged entitlement to $79,120 for amounts held after alleged substantial completion of the project.

Dated: February 5, 2024

DAVID B. STINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62657, 62975, 63200, Appeals of BCI Construction USA, Inc., rendered in conformance with the Board's Charter.

Dated: February 6, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

50